## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FLOWBEE INTERNATIONAL, INC. and<br>FLOWBEE HAIRCUTTER<br>LIMITED PARTNERSHIP,<br><br>    Plaintiffs,<br><br>v.<br><br>GOOGLE, INC.,<br><br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No._____ |

## COMPLAINT

Plaintiffs Flowbee International, Inc. ("Flowbee Int'l") and Flowbee Haircutter Limited Partnership ("Flowbee L.P"), (collectively "Flowbee"), by and through its counsel, for its complaint against Google, Inc. ("Google"), alleges as follows:

### NATURE OF THE ACTION

1.     This lawsuit relates to the use of trademarks on the Internet, particularly Google's unauthorized use of the famous trademark and service mark that identifies Flowbee to Internet users.  The fundamental purpose of trademark law, in the bricks-and-mortar world and on the Internet, is to protect consumers from being confused as to the source or affiliation of the products or services that they seek to buy.  In order to assist consumers in making informed purchasing decisions, trademark law encourages companies to develop brand names, such as Flowbee, to differentiate their products and services within the marketplace.  This is accompanied by legally limiting a brand's use to the brand's owner.  This legal protection fully applies in the context of the Internet.

2.     Unfortunately, some individuals and entities attempt to take advantage of consumers by marketing their products or services using the brands of others. In effect, they seek a free ride on the reputation and goodwill of another's brand. Because of the ease and low cost of setting up a website and the speed with which Internet transactions occur, this has become a particular and growing problem in connection with consumer purchases of goods and services on the Internet. This lawsuit involves exactly such a situation: efforts by certain companies to free ride on Flowbee's reputation and goodwill through use of Google's technology.

3.     Google owns and operates one of the world's largest Internet search engines. A search engine is a computer program that allows computer users to search the World Wide Web for websites containing particular content. Google's search engine is available not only on its own website (www.google.com), but also through other popular websites that use its search engine. On information and belief, more than half of all searches conducted worldwide use Google's search engine.

4.     To use Google's search engine, a World Wide Web user ("web user") need only type in a few words and hit the "enter" key (or click on the "Google Search" button) to receive a list of hyperlinks ("links") to web pages that Google identifies as relevant to the search requested. Web users may then visit these web pages by clicking on the links that Google provides. Google maintains and, on information and belief, many consumers believe that the search results that Google provides are the product of an objective formula or algorithm that produces "natural" or "organic" results, *i.e.*, web listings the placement of which is not influenced by payments to Google from the website owners.

5.     Google, however, does not only provide Internet users with such "natural" results. Without authorization or approval from Flowbee, Google has sold to third parties the "right" to use the trademark and service mark of Flowbee Int'l (the "Flowbee Mark") or words, phrases, or terms confusingly similar to this mark, as "keyword" triggers that cause paid advertisements, which Google calls "Sponsored Links," to appear above or alongside the "natural results." In many cases, the text and titles of these "Sponsored Links" use the Flowbee Mark or terms confusingly similar to this mark. Thus, when consumers enter the Flowbee Mark into Google's search engine to search or navigate the World Wide Web, instead of being directed to Flowbee's website, Google's "Sponsored Links" may instead misdirect them to: (1) websites of others that compete with Flowbee; (2) websites that sell vacuum haircutters, not only Flowbee's website, but also a variety of competitors' websites; or (3) websites that are entirely unrelated to Flowbee.

6.     Flowbee does not bring this lawsuit lightly. Flowbee has long been and remains a strong supporter of the Internet and the promise that it holds for consumers and society as a whole. Flowbee does not question that Google's search engine provides consumers with a powerful and highly-useful means to search the Internet for information. That said, Google's search engine is helping third parties to mislead consumers and misappropriate the Flowbee Mark by using them as "keyword" triggers for paid advertisements and by using them within the text or title of paid advertisements. This lawsuit seeks to stop only this aspect of Google's search engine function, and not its ability to provide objective or "natural" results. Indeed, Google appears to have the ability to structure and configure its programming to stop this misuse of the Flowbee Mark because it has already implemented procedures with

respect to European Internet users that prevent the misuse of trademarks.  Google, however, has chosen not to implement these procedures for Internet users in the United States to the detriment of consumers and Flowbee alike.

## THE PARTIES

7.    Plaintiff Flowbee International, Inc. is a corporation organized under the laws of the state of Wyoming with its principal place of business in Corpus Christi, Texas.

8.    Plaintiff Flowbee Haircutter Limited Partnership is a limited partnership organized under the laws of the state of Texas with its principal place of business in Corpus Christi, Texas.

9.    Upon information and belief, Defendant Google is a corporation organized under the laws of the State of Delaware with a principal place of business in Mountain View, California.  In addition, on information and belief, Google advertises, solicits clients, leases office space, and conducts substantial amounts of business in the State of Texas and within the Southern District of Texas and Corpus Christi, Texas. Google may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, at the following address:  701 Brazos, Suite 1050, Austin, Texas 78701.

## JURISDICTION AND VENUE

10.    This action arises in part under the Lanham Act, 15 U.S.C. §§ 1114, and 1125.  This Court has federal question jurisdiction over these claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), and 1338(b).  This Court has supplemental jurisdiction over the Texas State law claims pursuant to 28 U.S.C. § 1367(a) because

those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

11.     Google is subject to personal jurisdiction in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-.045 because, on information and belief, Google practices the unlawful conduct complained of herein, in part, within the District; because the unlawful conduct complained of herein causes injury, in part, within the District; because Google regularly conducts or solicits business, rents or leases office space within the District, engages in other persistent courses of conduct and/or derives substantial revenue from goods and/or services used or consumed within the District; and because Google regularly and systematically directs electronic activity into the State of Texas with the manifested intent of engaging in business within the District, including the creation, hosting, and offering of fully interactive websites, advertising, e-mail, and other Internet-related services to web users within this District, as well as entry into contracts with residents of the District.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rising to the claims herein occurred in this District.

13.     Venue is also proper in this District under 28 U.S.C. §§ 1391(b)(1) and (c) because Google is a corporation whose contacts would be sufficient to subject it to personal jurisdiction if this District were a separate state, as alleged above in this Complaint.

## FACTUAL BACKGROUND

### The Internet and the World Wide Web

14.    The Internet is a global network of millions of interconnected computers. The World Wide Web is a portion of the Internet especially well-suited to displaying images and sound as well as text.  Much of the information on the World Wide Web is stored in the form of web pages, which can be accessed through a computer connected to the Internet (available through commercial Internet service providers or "ISPs"), and viewed using a computer program called a "browser," such as Macintosh Safari or Microsoft Internet Explorer. "Websites" are locations on the World Wide Web containing a collection of web pages.  A web page is identified by its own unique Uniform Resource Locator ("URL") or "web address" (e.g., http://www.flowbee.com), which ordinarily incorporates the website's "domain name" (e.g., "flowbee.com"). Because URLs and domain names are not case sensitive, URLs and domain names that contain capital letters are functionally the same as those that do not.

### Flowbee's History

15.    Flowbee is the main manufacturer of vacuum haircutters worldwide. Flowbee's sales occur primarily on the World Wide Web through Flowbee's Internet based store at www.flowbee.com.

16.    Flowbee has been the principal manufacture of vacuum haircutters since 1987.   Flowbee has gained worldwide recognition and has become a well-known product in its classification.

17.    Originally, Rick Hunts, owner and inventor of the vacuum haircutter, began his business as Vac-U-Cut Corporation in California in 1987.  Mr. Hunts commissioned the trademark "Flowbee" (Registration Number: 1489925) to Vac-U-Cut Corporation in 1987.  Soon thereafter, Vac-U-Cut Corp. assigned all of its assets and business, including the Flowbee Mark, to a new company, Flowbee Int'l.  Flowbee Int'l has been a successful business ever since.

18.    Upon moving to Corpus Christi, Texas, Mr. Hunts founded Flowbee Haircutter Limited Partnership.  At the time, he and his wife were each limited partners.

19.    After the formation of Flowbee L.P., Flowbee Int'l licensed the exclusive right to use the Flowbee Mark to Flowbee L.P., which uses the mark to market and sell Flowbee products.

20.    According to the United States Patent and Trademark Office, the details of the Flowbee Mark are as follows:

> "Flowbee", U.S. Registration Number 1489925, Filed on October 22, 1987, Published for Opposition on March 8, 1988, Registered on May 31, 1988. First Registered by Vac-U-Cut Corp. of California. Last Listed Owner: Flowbee International Corporation of California and Owned by Rick Hunts of Corpus Christi, Texas. The Trademark is Live.

21.    Flowbee has common law rights to the Flowbee Mark in Texas by virtue of the mark's eligibility for protection and Flowbee's status as the senior user of the mark.

22.    The Flowbee Mark is unique and a famous distinctive designation of the source of Flowbee's products.  The Flowbee Mark and the name "Flowbee" has no meaning other than as it pertains to the Flowbee haircutter product.  It has no other descriptive or geographic meaning.

23.     Flowbee has invested in worldwide advertising and marketing in order to build the fame, reputation, and goodwill of the Flowbee Mark.

24.     Flowbee promotes its products on the Internet.

25.     Through Flowbee's actions, and because of widespread and favorable public acceptance and recognition, the Flowbee Mark has become a distinctive designation of the source of origin of Flowbee's goods and products.  The Flowbee Mark has become uniquely associated with, and hence identifies, Flowbee. This mark is an asset of incalculable value as a symbol of Flowbee, its quality goods and products, and its goodwill and reputation.

26.     Accordingly, the Flowbee Mark has developed secondary meaning.

27.     The Flowbee Mark has become "famous" within the meaning of the dilution provisions of the Lanham Act, 15 U.S.C. § 1125(c).  For example, as a result of Flowbee's extensive advertising and promotional efforts and its continuous use of the core service marks "flowbee" and "flowbee.com," Flowbee has, on information and belief, attained some of the highest levels of brand recognition among vacuum haircutters.

28.     On flowbee.com, Flowbee allows consumers to find, purchase, and learn about Flowbee products.

29.     Flowbee conducts a substantial amount of its business over the Internet and has made a sizeable investment in the development of its online business.  It is generally more beneficial for Flowbee when consumers purchase their vacuum haircutters directly through Flowbee.com. Among other reasons, this is because when consumers purchase vacuum haircutters through flowbee.com, it assists Flowbee in conveying important information to its customers, in developing a direct relationship

and future business with its customers, and often in minimizing costs associated with various transactions.

30.    Flowbee allows its authorized distributors, (including but not limited to Amazon.com) to offer consumers the opportunity to purchase Flowbee under certain conditions. Among the conditions, Flowbee requires these distributors to agree not to "purchase, use, or register any domain names or keywords or search terms that are identical or similar to, or contain (in whole or in part), any of the Flowbee Mark."

### Google's Search Engine

31.    Web users who are searching for a specific company product or information, but who do not know the exact domain name or website address at which it may be found, may use an internet "search engine" to locate websites. In fact, many Internet users prefer to navigate the Internet by typing phrases and event URLs into search engines rather than type a URL into an Internet browser's address bar. A search engine, such as Google's, purportedly checks the terms entered into it against its databases and applies a formula or algorithm to produce a search results page that lists the websites that may relates to the customer's search terms and their corresponding links.

32.    Google claims, and, upon information and belief, most web users who perform searches with Google's Internet search engines believe, that the results given by these search engines are determined by a "natural" or "organic" system that lists results in order of objective relevance to the search terms input into the search engine, with the most relevant websites appearing near the top of the web page. According to Google, Google's order of results is automatically determined by several factors, including [its] patented PageRank algorithm. Google describes this "natural" PageRank

system as "democratic," gauging the objective popularity of various websites by interpreting a link from one website to another as a vote for the usefulness of the linked website (where the weight of the vote itself depends on the popularity of the linking site).

33.    On information and belief, among other kinds of searches, Google encourages consumers to use its website to find other websites that offer particular products and services.

34.    By using Google's Internet search engines, web users are identifying to Google the subjects in which they are interested, the companies that they seek, or the goods or services they wish to buy.   This allows Google to obtain a significant percentage of its profits from "contextual" or "search" advertising, which allows companies to place their advertising in front of consumers who have already identified themselves as interested in particular products or services.

35.    When a web user carries out an Internet search using Google's search engines, Google not only provides the web user with purportedly objective "natural" results, but also displays a list of similarly formatted advertisements – to which Google refers as "Sponsored Links" – above and alongside their purportedly objective "natural" search results.

36.    On information and belief, the relevance of the natural results is not solely determined by an objective measure, but influenced by advertising.

37.     For example, when one searches "flowbe.com," in addition to a sponsored link to Flowbee's competitor above or to the right of the search result, Google asks "Did you mean: flowbee.com" and displays a listing of two results. However, in the official results listing, Google directs searchers to www.flowbe.com, which is a site sponsored by Google and designed to draw consumers away from Flowbee products. www.flowbe.com is designed as an addition to Google's Adwords and "sponsored links" program as seen in the following screenshots:









38.     Google specifically sponsors complete websites that contain Flowbee's trademark and terms confusingly similar as advertising agents. These websites, such as the one depicted above, directly infringe and dilute Flowbee's trademark and cause irreparable damage to the Flowbee brand name, reputation, and business model.

39.     On information and belief, the relevance of the "Sponsored Links" is determined not by a so-called objective measure, as claimed by the "natural" search results, but rather is substantially influenced by the amount of money the sponsors of these links are willing to pay Google.

40.     Google's use of the Flowbee Mark and terms confusingly similar thereto in order to display "Sponsored Links" falsely communicates to consumers that Google's advertisers are official Flowbee affiliates, or that Flowbee sponsors or endorses Google's advertisements.   On information and belief, many consumers incorrectly believe that

Flowbee "sponsors" these "Sponsored Links" because of Google's confusing use of the term "Sponsored Links." In many cases, Google exacerbates this confusion by publishing text in its "Sponsored Links" that makes further confusing use of the Flowbee Mark.

41.     Further, when some web users click on the links that Google's advertisers pay to place above or alongside purportedly objective "natural" results in order to seek information about Flowbee's products, they are likely to be deceived into believing that they will be provided with official information about Flowbee's products directly from Flowbee. On information and belief, however, some of these links and the websites to which they lead provide no such information. In fact, in some instances, some of these links lead to websites that offer the products of Flowbee's competitors, whether or not they also offer Flowbee's own products.

42.     Google's unauthorized use in commerce of the Flowbee Mark generates profits for Google and its advertisers that are directly attributable to their unauthorized exploitation of the value and name recognition associated with the Flowbee Mark.

43.     Google's search engine is available, among other places, through its website located at www.google.com. Google also licenses its search engine to other popular websites, such as America Online, Netscape, Earthlink, CompuServe, Shopping.com, AT&T Worldnet, and Ask.com.[1] In addition, Google invites consumers to affix a "Google Toolbar" at the top of Internet users' Internet browsers that allows these users to conduct Google searches even when they are not currently visiting www.google.com or a website that features Google's search engine.[2]

---

[1] *See* https://adwords.google.com/support/bin/answer.py?answer=6119&hl=en_US (visited July 20, 2009).
[2] *See* http://toolbar.google.com/T4/index_pack.html (visited July 20, 2009)

44.    In 2006, *The Economist* magazine reported that Google's lead in the Internet search engine market "looks daunting," with "an American market share of 43% as of April, which reaches 50% counting AOL, an Internet property that uses Google's search technology."[3]    On information and belief, since then, Google has increased its market share to 62.7% as of June 2007.[4]

### Google's Search Engine-Based Keyword Advertising Program

45.    Google offers a program called "AdWords" that displays advertisements to users of Google's search engine in the form of "Sponsored Links."    Google offers advertisers the ability to select certain "keywords" that will trigger a Sponsored Link to the advertiser's chosen website, which Google will display above or alongside the purportedly "natural" search results.

46.    Google has described keyword triggers as the advertiser's window into the customer's thinking – the most important basis for directing [an] advertising message to precisely those people who want to see it. According to Google, these keywords are uncannily accurate in [their] ability to bring buyers and sellers together, that is, they are used to develop web traffic and business for third-party websites from unsuspecting consumers searching for a specific—and often related—website.

47.    On information and belief, advertisers pay Google each time a web user clicks on "keyword-targeted" Sponsored Links that appear on Google's "results" page.

---

[3]  *See Internet Search Engines: The Un-Google, THE ECONOMIST,* July 20, 2009, at 86.
[4]  *See* http://google.blognewschannel.com/index.php?s=google+losses+search+market+share (visited July 20, 2009)

48.     These targeted Sponsored Link "results" are not meaningfully or conspicuously identified to consumers as paid third-party advertisements. Most often, Google posts its Sponsored Link advertisements in a color, typeface, and font size that are not appreciably different than the results that Google's PageRank system generates. On information and belief, even the designation of these keyword-triggered "results" as Sponsored Links is confusing to many consumers, because Google does not inform consumers who has done the "sponsoring".

49.     On information and belief, in a substantial portion of searches, Google's AdWords program makes two distinct uses of a given keyword on behalf of an advertiser.   First, Google uses the keyword to trigger the Sponsored Link advertisement.   Second, Google sometimes publishes the keyword as part of the advertisement itself.   Accordingly, when the keyword in question is a trademark or service mark, Google can make confusing use of that mark in two different ways: (1) as a keyword trigger and (2) as a part of the advertisement itself.

### Google's Unwillingness To Refrain From Trademark Infringement

50.     On information and belief, some time after August 24, 2004, Google adopted a "trademark policy" and a "trademark complaint procedure" (collectively, Google's "trademark policy"), with the stated purpose of "tak[ing] allegations of trademark infringement very seriously."[5]  "Further, its terms and conditions purport to "prohibit intellectual property infringement by advertisers."[6]

---

[5]  *See* https://adwords.google.com/support/bin/answer.py?answer=6118 (visited July 20, 2009).
[6]  *See* http://adwords.google.com/select/imageguidelines.html (visited July, 20 2009)

51.    This "trademark policy" is manifestly deficient.

(a)    First, Google is willing to use proprietary marks as *keyword triggers* within the United States and Canada.  Google's "trademark policy" within the United States and Canada purports to apply to only advertisement text, and expressly states that Google "**will not disable keywords in response to a trademark complaint.**"[7]

(b)    Second, although Google's "trademark policy" purports to prevent Google from publishing *Sponsored Links* that infringe on the proprietary trademarks or service marks of others, Google does not make an affirmative commitment to prevent such infringements.  Instead, Google states that its willingness to "perform a limited investigation of reasonable complaints" exists only "as a courtesy" and not as a matter of binding policy.[8]

(c)    Third, even if Google made a more binding commitment to refrain from publishing advertisements that infringe, its policy still puts the onus on the trademark owner to identify and complain about each infringement use, while Google disclaims responsibility for the advertisements that it publishes on *its own website*.  Because the content on Google's website is constantly changing, however, it is effectively impossible for even the most vigilant owner of a mark to defect all infringing uses on Google's website.

---

[7] *See* http://www.google.com/tm_complaint_adwords.html (visited July 20, 2009) (emphasis in original.)
[8] *See id.*

(d)     Fourth, although Google's programming sometimes requires advertisers to obtain an exemption from Google before Google will publish advertisements that make exact use of certain proprietary marks, Google's programming is not preventing all advertisers from posting advertisements that make use of terms that are confusingly similar to the marks of others, or are otherwise formatted in a way that is likely to cause consumer confusion.

52.     On information and belief, Google has the ability to refrain from making infringing use of proprietary marks as part of its keyword-triggered advertising program.

53.     Specifically, on information and belief, Google could reasonably prevent trademarks, service marks, and terms confusingly similar thereto from being used as keyword triggers or in the title or text of Sponsored Link advertisements.

54.     Google has stated in its SEC filings that it formerly did not allow advertisers to use the trademarks of others as keyword triggers.   (*See* Form S-1 Registration Statement, Google, Inc., April 29, 2004 ("Google S-1"), p. 10).

55.     Consistent with that statement, in a Declaration filed in *American Blind and Wallpaper Factory, Inc. v. Google, Inc., et al.,* a trademark case filed in the United States District Court for the Southern District of New York, Google's Senior Trademark Counsel asserted on April 7, 2004, that Google had the capability to block its advertisers from using non-descriptive trademarks as keyword triggers. (Declaration of Rose A. Hagan in Support of Google, Inc., Ask Jeeves, Inc., and Earthlink's Motion to Dismiss or, in the Alternative, to Transfer Venue, filed April 9, 2004, ¶ 4).

56.     Google, however, now allows advertisers to purchase specific trademarks

as keyword triggers for Sponsored Link advertisements.   In its 2004 S-1, Google stated

as follows:

> In order to provide users with more useful ads, we have recently revised
> our trademark policy in the U.S. and in Canada.  Under our new policy,
> we no longer disable ads due to selection by our advertisers of trademarks
> as keyword triggers for the ads.

(Google, S-1, p. 10).

57.     Google  has  further  stated  that  it  anticipates  additional  trademark

infringement lawsuits because of its decision to allow its advertising customers to use

trademarks to trigger the delivery of Sponsored Links:

> As a result of this change in policy, we may be subject to more trademark
> infringement lawsuits….  Adverse results in these lawsuits may result in,
> or eventually compel, a change in this practice, which would result in a
> loss of revenue for us, which could harm our business.

*Id.*

58.     In contrast to its practices with respect to the use of trademarks in the

United States, Google represents that it currently prevents advertisers from using

trademarks as keywords *outside* the United States and Canada.  According to Google's

trademark policy for "Trademark rights outside US and Canada," Google will "ensur[e]

that the advertisements at issue are not using a term corresponding to the trademarked

term in the ad text *or as a keyword trigger*."[9]

59.     Additionally, Google maintains an extensive trademark policy regarding

confusing uses of *its own* marks.  A would-be user of a Google mark must, *inter alia*,

"use the trademark only as an adjective, never as a noun or verb, and never in the

---

[9]  http://www.google.com/tm_complaint_adwords.html (emphasis added) (visited July 20,
2009).

plural or possessive form," and must put "a minimum spacing of 25 pixels between each side of the logo and other graphic or textual elements on [the user's] web page."[10] Google, in its own words, instructs the world not to "mess around with our marks." "Don't remove, distort or alter any element of a Google Brand Feature... for example, through hyphenation, combination or abbreviation."[11]   Google does not, however, treat the marks of other companies with such respect.

## Google's Unauthorized Use of the Flowbee Mark

60.     Flowbee has not given Google any permission, authority, or license to use or sell the right to use the Flowbee Mark for the promotion of the goods and services of any third parties, either directly or indirectly.

61.     Nevertheless, on information and belief, Google has in fact sold to third-party advertisers the "right" to use the Flowbee Mark or terms confusingly similar thereto as part of Google's search engine-based advertising program.  As a result, Google's programming utilizes the expressed interest of Internet users in the Flowbee Mark to trigger advertisements to websites that is not Flowbee's website, some of which even compete with Flowbee. In fact, many of Google's Sponsored Links are expressly designed to draw consumers *away* from Flowbee's website.

62.     Moreover, Google's use of Flowbee's Mark within the titles and text that Google posts as a part of its Sponsored Links further misleadingly communicates to consumers that such links are endorsed or sponsored by Flowbee or its affiliates, or that such websites are official Flowbee websites.

---

[10]  "Google Permissions," http://www.google.com/permissions/guidelines.htlml (visited July 20, 2009).
[11] *See id.*