**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| FLOWBEE INTERNATIONAL, INC. | § | |
| and FLOWBEE HAIRCUTTER | § | |
| LIMITED PARTNERSHIP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. C-09-199 |
| | § | |
| GOOGLE INC., | § | |
| | § | |
| Defendant. | § | |

---

**DECLARATION OF MARGRET M. CARUSO**

1.      My name is Margret M. Caruso.  I am over the age of 21, of sound mind, have never been convicted of a felony, am competent to make this Declaration, and every statement herein is within my personal knowledge and is true and correct.

2.      I am an attorney of record for Defendant Google Inc.  In that capacity, I have gained personal knowledge of the facts contained herein, each of which is true and correct.

3.      Attached to this declaration as Exhibit A is a true and correct copy of Yahoo! Inc.'s Terms and Conditions, which was at issue in the case *In re Yahoo!*, Case No. 4:08-CV-626-A (N.D. Tex. 2009), as filed with Yahoo!'s Motion to Transfer, filed on November 25, 2008, and retrieved from the Public Access to Court Electronic Records ("PACER") system.

4.      Attached to this declaration as Exhibit B is a true and correct copy of an excerpt of the Reporter's Transcript Motions Hearing in *Rosetta Stone Ltd. v. Google, Inc.*, Civil Action No. 1:09cv736, in the United States District Court for the Eastern District of Virginia, dated

September 18, 2009, which contains the Court's rulings on Google's motion in that action, starting at line 24 on page 25.

5.     Attached to this declaration as Exhibit C is a true and correct copy of the Court's "Order Denying Motion for Preliminary Injunction; Vacating Hearing," which was entered in *Robocut, Inc. v. Flowbee International, Inc.; Flowbee International, Inc. v. Robocut, Inc. & Alfred Natrasevchi*, Case No. 3:04-cv-00979-MMC, in the United States District Court in the Northern District of California, as retrieved from the PACER system.

6.     Attached to this declaration as Exhibit D is a true and correct copy of the Court's "Order of Dismissal," which was entered in *Robocut Inc. v. Flowbee International, Inc.; Flowbee International, Inc. v. Robocut, Inc. & Alfred Natrasevchi*, Case No. 3:04-cv-00979-MMC, in the United States District Court in the Northern District of California, as retrieved from the PACER system.

7.     Attached to this declaration as Exhibit E is a true and correct copy of an excerpt of the Transcript of Initial Pretrial Conference in *Flowbee International, Inc. et. al. v. Google, Inc.*, Case No. C-09-199, in the United States District Court for the Southern District of Texas, dated September 23, 2009.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: *Oct. 6, 2009*

Margret M. Caruso

# EXHIBIT A

Yahoo!

# YAHOO! TERMS

**Terms And Conditions &amp; Program Terms**

Yahoo! Info Center > Yahoo! Terms Center > Advertising > Terms And Conditions & Program Terms

Email    Print

## Master Terms and Conditions and Program Terms

**Master Terms and Conditions**

1.  **INTRODUCTION AND DEFINITIONS.** We provide you and, if applicable, Authorized Users, access to our products, services, code, and/or programs (each a "**Program**") for your use, subject to your acceptance of and compliance with these Master Terms and Conditions (the "**Master Terms and Conditions**"), the terms and conditions, if any, of the Programs in which you enroll (each "**Program Terms**"), and the terms and conditions of any applicable insertion order(s) that you or your Affiliate(s) enter into that specifically references these Master Terms and Conditions and/or applicable Program Terms (each an "**Insertion Order**") (collectively, the "**Agreement**"). In the Agreement, **(i) "we," "us," and "our" mean Yahoo! Inc. ("Yahoo!"), except as set forth in Section 12, below, (ii) a "Yahoo! Company" means Yahoo!, Yahoo! SARL, or an Affiliate of Yahoo! or Yahoo! SARL**, (iii) "**Yahoo! Entities**" are the Yahoo! Companies and their officers, directors, consultants, contractors, agents, attorneys, employees, third-party service providers, and third parties distributing your ads via the Distribution Network, (iv) "**Yahoo! Company Websites**" means all the website pages, including any Microsite, that are owned, operated, authorized, or hosted by or for the Yahoo! Companies, (v) "**Yahoo! Code**" is proprietary software code and related tools that we may offer to you in connection with a Program, and which are part of such Program, (vi) "**Distribution Network**" means the network of advertising channels, including all forms of media, applications, and devices, through which we distribute ads, whether on or off the Yahoo! Company Websites, (vii) "**you**" and "**your**" mean the entity electronically accepting the Agreement, or the company named in an Insertion Order, and any of its Affiliates that execute an Insertion Order for any Program, (viii) "**Affiliate**" means, with respect to an entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with such entity, (ix) "**Authorized Users**" means your agents, representatives, contractors, and any person or entity acting or apparently acting on your behalf, and your Affiliates that access a Program without executing their own separate Insertion Order, and (x) "**PII**" means personally identifiable information. Terms used but not defined herein have the meanings given to such terms in any Program Terms or Insertion Order, as applicable. Terms used in any Program Terms or Insertion Order, but not defined therein, have the meanings given to such terms in these Master Terms and Conditions. All definitions apply both to their singular and plural forms, as the context may require.

2.  **CHARGES, FEES, AND PAYMENT.** For any Program in which you enroll, you will pay us for all charges and fees you incur in connection with each Program in the currency indicated by us. Our measurements are the definitive measurements under the Agreement and will be used to calculate your charges. We will either bill your Payment Method for all such charges and fees in connection with each Program, or, if we have determined that you may be billed on an invoice basis, we will submit an invoice to you at the e-mail or mailing address (at our discretion) on the Insertion Order or as required by applicable law, and you will pay such charges in full within 30 days of the invoice date. If we agree to your request to send an invoice to a third party on your behalf, such third party will timely pay the invoice, and if such party does not pay the invoice, you will immediately pay all such

amounts. If you enroll in a Payment Plan, you will be bound by the Payment Method & Payment Plan Program Terms, below, which may be modified by us from time to time. If we are unable to receive payment from your Payment Method successfully, or if we do not otherwise receive timely payment, you will pay all amounts then owing by you to us upon our demand and, in addition to other rights, we may terminate any agreement with you. All payments of service fees, unused promotional credits, and initial deposit(s) are non-refundable and our property. Any disputes about charges to your account(s) must be submitted to us in writing within 60 days of the date you incurred such charge, otherwise you waive such dispute and such charge will be final and not subject to challenge. If you fail to make payment as set forth herein, you will pay a late fee equal to 1% monthly (or the highest amount allowed by law if less than 1% monthly) of all past due charges, and all reasonable expenses (including attorneys' fees) incurred by us in collecting such charges. Charges and fees do not include any applicable sales, use, value-added, withholding, excise, or any other taxes or government charges, which are payable by you and are in addition to any amounts due to us hereunder. Accounts with no activity for more than 24 months will be closed by us and will be assessed an account closing fee not to exceed the lesser of U.S. $25 (or its equivalent) or the balance in the account. If a balance remains (other than unused promotional credits and initial deposits), we will attempt to refund any portion of such balance that may be owed to you. If we are unable to refund any such balance using your contact information on file with us, we will dispose of the balance pursuant to the Agreement and our policies and procedures.

3.  **ACCESS.** You will not: (i) use any automated means, including agents, robots, scripts, or spiders to access, monitor, scrape, or manage your account(s) with us, or to access, monitor, scrape or copy the Yahoo! Company Websites or Yahoo! Company systems or any data therein, except those automated means expressly made available by us or authorized by us in advance in writing (e.g., third-party tools approved by us), (ii) bypass any robot exclusion headers on the Yahoo! Company Websites (including using any device, software, or routine to accomplish that goal), (iii) interfere or attempt to interfere with the proper working of the Yahoo! Company Websites, Programs, or Yahoo! Company systems, (iv) use or combine our Programs with software offered under an open source license which create any obligations with respect to our Programs contrary to the Agreement, or grant to any third party any rights to, or immunities under, our intellectual property or proprietary rights in our Programs, or (v) make available to us or our Affiliates any PII of visitors, users, or customers of your website(s) in connection with your access or use of our Program(s). Our Programs, including your password(s) related to your account(s), may not be used by, or made available to, any third party, except Authorized Users. You will promptly notify us in writing if you become aware of a potential breach of security relating to your account(s) with us (e.g., the unauthorized disclosure or use of your username or password). Authorized Users must comply with the Agreement and you are liable for their acts and omissions in connection with the Agreement, and any charges, costs, fees, or expenses they may accrue. You may use data made available to you in connection with a Program solely for internal use to manage your advertising account(s) with us and you will neither publish such data nor create profiles of our users. In order to improve our Programs, we frequently test traffic, implementations, and/or features, and you will pay for all charges as set forth in the applicable Insertion Order or your online account (e.g., impressions, clicks) during those tests. We may redesign or modify the organization, specifications, structure, and/or appearance of any location where your ads may be displayed. Further, we reserve the right to modify or discontinue offering any Program or part thereof. Your Information, Promotions (if applicable), and ads must comply with our policies and specifications, which we may change from time to time. The Yahoo! Companies may provide free clicks, free impressions, ads, credits, and/or discounts, including in connection with contests, incentives, promotions, or donations.

4.  **YOUR SITE AND INFORMATION.** We are not responsible for any aspect of your or any third-party website(s). You represent, warrant, and covenant that: (i) all information you provide or use (including our suggestions) in connection with the Agreement and/or on your website, including all creative, titles, descriptions, trademarks, listings, abstracts, keywords, ad target options, domain names, content of ads, data, data feeds, Selected Ad Groups, Content, and URLs (each of the foregoing, individually and collectively,

"**Information**") is, and will be updated to remain, current and accurate, (ii) the website to which any ad links will look substantially the same to all end users regardless of the end users' location, (iii) your website does not contain any content owned or licensed by us, including any ads published by us or through the Distribution Network, except pursuant to a separate signed agreement with us, and (iv) your Information is either original to you or you have secured all necessary rights and licenses for its use as contemplated by the Agreement, and you are responsible for all royalties, payments, and fees with respect thereto (e.g., performing rights society fees).

5. **USE OF INFORMATION.** In order to participate in any Program, you grant the Yahoo! Entities a non-exclusive, royalty-free, worldwide license in connection with all Programs to: (i) use, copy, adapt, reformat, recompile, communicate by telecommunication, truncate, edit, and/or modify any part of the Information for public performance, public display, and distribution, (ii) access, index, cache, and display the website(s) to which your ads link, or any portion thereof, by any means, including web spiders and/or crawlers, (iii) create and display copies of any text, images, graphics, audio, or video on the websites to which your ads link, and (iv) distribute your ads through the Distribution Network. None of the Yahoo! Entities will have any liability for your ads or Information, including your Selected Ad Groups. You will provide all Information to us for our review before it is posted to the Distribution Network. A Yahoo! Entity may refuse, reject, cancel, or remove any ad, Information, or space reservation at its discretion at any time. Your ads may be subject to inventory availability, and the final decision as to ad relevancy is at our discretion. We do not guarantee that your ads will be placed in, or available through, any part of the Distribution Network, nor do we guarantee that your ads will appear in a particular position or rank.

6. **CONFIDENTIALITY.** "**Confidential Information**" means any information disclosed to you by us, either directly or indirectly, in writing, orally, or by inspection of tangible objects, other than information that you can establish: (i) was publicly known and made generally available in the public domain prior to the time of disclosure to you by us, (ii) becomes publicly known and made generally available after disclosure to you by us other than through your action or inaction, or (iii) is in your possession, without confidentiality restrictions, prior to the time of disclosure by us, as shown by your files and records. You will not at any time: (i) sell, license, or transfer any Confidential Information, (ii) disclose or otherwise make available to any person or entity any Confidential Information (other than to those of your employees and Authorized Users who are bound in writing by use and confidentiality restrictions which are no less protective of us than those contained in the Agreement and who have a legitimate need to know such Confidential Information in connection with the Agreement), or (iii) access, use, reproduce, or copy any Confidential Information, except as necessary in connection with the purpose for which such Confidential Information is disclosed to you and in accordance with the Agreement. You will take all measures to protect the secrecy of, and to avoid disclosure and unauthorized use of, the Confidential Information. If required by law to disclose Confidential Information, you may do so provided that: (i) you give us prompt written notice of such requirement prior to such disclosure, (ii) at our request, you assist us in obtaining an order protecting the Confidential Information from public disclosure, and (iii) any such disclosure is limited to the minimum extent necessary to comply with the legal requirement. All Confidential Information will remain our personal property, and all documents, electronic media, and other items containing or relating to any Confidential Information must be delivered to us, destroyed, or uninstalled immediately upon our request, or upon termination of the Agreement. Nothing contained in the Agreement will prevent a Yahoo! Company from complying with applicable privacy laws and regulations, and if there is any conflict between the Agreement and the terms of the applicable Yahoo! Company privacy policy ("**Privacy Policy**") (as posted on or linked from a Yahoo Company Website), the Agreement will control. Notwithstanding anything to the contrary in the Agreement or the applicable Privacy Policy, all data and information gathered or received by us in connection with providing the Programs and all information described in the applicable Privacy Policy may be shared with and used by (x) the Yahoo! Entities (and you acknowledge the country of the Yahoo! Entity receiving the data or information may not afford the same level of protection of such data as the country in which the data or information was collected),

and/or (y) certain selected third parties only in anonymous form. You may not issue any press release or other public statement regarding the Agreement, the Programs, or a Yahoo! Company without our prior written consent.

7. **REPRESENTATIONS.** You represent, warrant, and covenant that: (i) you have the rights, authority, and any required permission and consent to enter into the Agreement, (ii) you are a business, not a consumer, (iii) your use of each Program is solely for lawful business purposes, (iv) all Information is free of viruses, Trojan horses, trap doors, backdoors, Easter eggs, logic bombs, worms, time bombs, cancelbots, and/or other computer programming routines that may potentially damage, interfere with, intercept, or expropriate any Yahoo! Company system data or information, (v) a click on your ad will not: cause damage to a user's computer, download a software application(s), change a user's settings, or create a series of multiple, sequential, stand-alone advertisements (including by pop-up window or pop-under window), (vi) you will not engage in, nor cause others to engage in, spamming or improper, malicious, or fraudulent (as determined by us) clicking, impression, or marketing activities relating to any Program, (vii) the Information, the ads (including products and services referenced therein), the website(s) to which the ads link, all emails, newsletters, and other materials and technology in connection therewith, any tools or code you use or make available in connection with a Program, and/or any act or omission by you relating to a Program or the Yahoo! Entities: (a) do not violate any applicable law, statute, directive, ordinance, treaty, contract, or regulation, or Yahoo! Company policies or guidelines (collectively, "**Laws**"), (b) do not infringe any copyright, patent, trademark, trade secret, or other intellectual property right of any person or entity, (c) do not breach any duty toward, or rights of, any person or entity, including rights of publicity and/or privacy, (d) are not false, deceptive, misleading, unethical, defamatory, libelous, or threatening, and (e) do not (as determined by us) reflect poorly on or tarnish the reputation or goodwill of a Yahoo! Entity, (viii) you will not reverse engineer, disassemble, reconstruct, decompile, copy, or create derivative works of any Programs, or any aspect or portion thereof, or Confidential Information, including source code or algorithms, (ix) you will not alter or remove any identification, trademark, copyright, or other notice from any aspect of the Programs, (x) you will comply with any trade sanction, and/or import or export regulation that applies to your use of our Programs and obtain all necessary licenses to use, export, re-export, or import our Programs as applicable, and (xi) you will not provide access to the Programs, except to Authorized Users or employees, who are bound in writing by use and confidentiality restrictions which are no less protective of us than those contained in the Agreement.

8. **INDEMNIFICATION.** You will indemnify, defend, and hold harmless the Yahoo! Entities from all claims, whether actual or alleged (collectively, "**Claims**"), that arise out of or in connection with your Information and/or ads, your or Authorized Users' use of any Program, Yahoo! Company system, or Yahoo! Company Website, your website, or your or Authorized Users' breach of the Agreement. You are solely responsible for defending any Claim against a Yahoo! Entity, subject to such Yahoo! Entity's right to participate with counsel of its own choosing, and for payment of all judgments, settlements, damages, losses, liabilities, costs, and expenses, including reasonable attorneys' fees, resulting from all Claims against a Yahoo! Entity, provided that you will not agree to any settlement that imposes any obligation or liability on a Yahoo! Entity without its prior express written consent.

9. **WARRANTY DISCLAIMER.** THE PROGRAMS, DISTRIBUTION NETWORK, YAHOO! COMPANY SYSTEMS, YAHOO! COMPANY WEBSITES, YAHOO! CODE, AND DOCUMENTATION ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTY, REPRESENTATION, CONDITION, OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, AND YOUR USE THEREOF IS AT YOUR OWN RISK. WE HEREBY DISCLAIM ON BEHALF OF ALL YAHOO! ENTITIES ANY AND ALL WARRANTIES, REPRESENTATIONS, CONDITIONS, OR GUARANTEES, INCLUDING ANY WARRANTIES OR CONDITIONS OF TITLE, MERCHANTABILITY, MERCHANTABLE QUALITY, SERVICE QUALITY, NONINFRINGEMENT, AND FITNESS FOR A PARTICULAR PURPOSE.

10. **LIMITATION OF LIABILITY.** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY LIABILITY OF THE YAHOO! ENTITIES IN CONNECTION WITH THE AGREEMENT, UNDER ANY CAUSE OF ACTION OR THEORY, WILL BE STRICTLY LIMITED TO THE LESSER OF THE AMOUNT ALREADY PAID BY YOU TO US PURSUANT TO THE AGREEMENT IN THE SIX-MONTH PERIOD PRIOR TO THE EVENT GIVING RISE TO THE CLAIM AND U.S. $250,000 (OR ITS EQUIVALENT). IN NO EVENT WILL ANY YAHOO! ENTITY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF, OR IN CONNECTION WITH, THE AGREEMENT. YOU WILL NOT HOLD A YAHOO! COMPANY RESPONSIBLE FOR THE SELECTION OR RETENTION OF, OR ANY ACTS, ERRORS, OR OMISSIONS BY, ANY THIRD PARTY IN CONNECTION WITH THE AGREEMENT, INCLUDING WITH RESPECT TO CLICKS AND/OR IMPRESSIONS BY ANY THIRD PARTY ON YOUR ADS, REGARDLESS OF THE INTENT OF SUCH THIRD PARTY.

11. **TERMINATION.** At any time, for any or no reason, you or we may terminate the Agreement and/or your participation in any Program, and we may suspend or limit your participation in any Program or part thereof, including removing your ads. The Yahoo! Entities will not have any liability regarding the foregoing decisions. Upon termination of any Program Terms or the suspension or discontinuation of any Program or your participation therein, your outstanding payment obligations incurred under such Program will become immediately due and payable. Sections 2, 3 (second, fourth, and fifth sentences only), 4(iii), and 5 through 15 of these Master Terms and Conditions, the defined terms of the Agreement, and those provisions specified in any Program Terms will survive termination of the Agreement.

12. **NOTICES.** We may give notices to you by posting on any Yahoo! Company Website, or by email to the address provided by you. You must ensure that your contact and account information is current and correct, and promptly notify us in writing of any changes to such information. You will send all notices to us via recognized overnight courier or certified mail, return receipt requested, to: General Counsel, Yahoo! Inc., 701 First Avenue, Sunnyvale, California 94089. If you enroll in a Program outside the United States, Canada, Argentina, Mexico, or Brazil, Yahoo! SARL will exclusively be "we," "us," and "our," as referred to throughout these Master Terms and Conditions, Program Terms, and any applicable Insertion Orders. The Agreement does not permit you to enroll in any of our Program(s) in Japan or the People's Republic of China or our Display Advertising Program in Australia or New Zealand.

13. **CHOICE OF LAW; VENUE.** The terms of the Agreement and any dispute relating thereto or between you and us will be governed by the laws of the State of California, without regard to conflict/choice of law principles. The United Nations Convention on Contracts for the International Sale of Goods does not apply to the Agreement. You agree to submit to the exclusive jurisdiction of the state and federal courts located in Los Angeles County or Santa Clara County, California, or another location designated by us. Any claim against us will be adjudicated on an individual basis and will not be consolidated in any proceeding with any claim or controversy of any other party.

14. **OTHER.** The Agreement constitutes the entire agreement and understanding between you and us regarding the subject matter contained herein and supersedes all proposals, representations, claims, and communications in all forms of media (including all instructions, advertisements, messages, and policies), written and oral, regarding the subject matter contained herein. No terms or conditions other than those set forth in these Master Terms and Conditions, any Program Terms or Insertion Order(s) will be binding on us unless expressly agreed to in writing by us. The terms of any specific Program Terms govern only that Program, and not any other Program, except as specifically referenced in such Program Terms. If there is a conflict between the Master Terms and Conditions, any Program Terms, and any Insertion Order, the conflict will be resolved according to the following order of precedence: (1) Program Terms, (2) Master Terms and Conditions, and (3) Insertion Order. Notwithstanding the foregoing, an Insertion Order may amend the Master Terms and Conditions and/or the applicable Program Terms only if the amended

terms contained in such Insertion Order: (i) apply only to the account(s) listed in the Insertion Order, (ii) apply only to that Insertion Order and not to any other Program or Insertion Order(s), and (iii) specifically identify the provision(s) of the Program Terms or the Master Terms and Conditions they amend. Only a written instrument specifically waiving compliance that is executed by whichever of you or us is entitled to waive such compliance may waive any term(s) and/or condition(s) of the Agreement. No waiver by you or us of a breach of any provision hereof will be deemed a waiver of any other breach of such provision or a waiver of the provision itself. If any provision of the Agreement is held or made invalid or unenforceable for any reason, such invalidity will not affect the remainder of the Agreement, and the invalid or unenforceable provision will be replaced by a valid provision that has a similar economic effect. We will have no liability under the Agreement by reason of any failure or delay in the performance of our obligations on account of strikes, shortages, riots, acts of terrorism, insurrection, fires, flood, storm, explosions, earthquakes, Internet and/or electrical outages, computer viruses, acts of God, war, governmental action, or any cause that is beyond our reasonable control. You and we are independent contractors and nothing in the Agreement will be construed to create, evidence, or imply any agency, employment, partnership, or joint venture between you and us. Except as otherwise set forth in the Agreement, neither you nor we will have any right, power, or authority to create any obligation or responsibility on behalf of the other and the Agreement is not intended to benefit, nor will it be deemed to give rise to any rights in, any third party. Notwithstanding the foregoing, you acknowledge and agree that the Yahoo! Companies will be third-party beneficiaries to the Agreement and will be entitled to directly enforce, and rely upon, any provision in the Agreement which confers a benefit on, or rights in favor of, them. You may not assign, sublicense, or transfer the Agreement or any right or duty under the Agreement. Any assignment, transfer, or attempted assignment or transfer in violation of this Section 14 will be void and of no force or effect. We and our subsequent assignees may assign, delegate, sublicense, or otherwise transfer from time to time the Agreement, or the rights or obligations hereunder, in whole or in part, to any person or entity such as to our Affiliate(s). The Programs are proprietary to us and are protected by the applicable state, federal, and international intellectual property laws and we retain all rights, title, and interests in the Programs, together with all derivative works, modifications, enhancements, and upgrades, but excluding your Information. Any rights not expressly granted in the Agreement are reserved by us, and all implied licenses are disclaimed. Headings used in the Agreement are for reference purposes only. As used in the Agreement, the word "including" is a term of enlargement meaning "including without limitation" and does not denote exclusivity, and the words "will," "shall," and "must" are deemed to be equivalent and denote a mandatory obligation or prohibition, as applicable. We may change the Agreement and/or a Privacy Policy at any time by posting such on the applicable Yahoo! Company Website or by email, and such revised Agreement and/or Privacy Policy will supersede and replace the earlier Agreement and/or Privacy Policy. Any use by you or Authorized Users of any Program after such notice will be deemed to be acceptance by you of the revised Agreement and/or Privacy Policy. Services and obligations to be performed by us hereunder may be performed by other Yahoo! Companies and/or third-party service providers.

15. **REPRESENTATIVE.** If you are an advertising agency, search engine marketer, reseller, or other entity representing Advertisers ("Representative"), this Section applies, and in such case, "you" and "your" mean Representative, any Affiliates of Representative who execute an Insertion Order, together with Advertisers. "Advertiser" means an entity (including a sole proprietor) which is/will be enrolled in a Program by you. a. Representative represents, warrants, and covenants that: (i) it is the authorized agent of the Advertiser and has the legal authority to enter into the Agreement on behalf of the Advertiser, make all decisions, and take all actions relating to the Advertiser's accounts, (ii) by Representative executing an Insertion Order or otherwise enrolling an Advertiser in a Program, the Advertiser is also entering into the Agreement, (iii) Representative will not, without our prior written consent: (a) make any representation, guarantee, condition, or warranty concerning any Program or Yahoo! Entity, including that Representative is an affiliate or partner of a Yahoo! Entity, (b) make any commitments (e.g., guarantees as to placement of ads) to an Advertiser or potential Advertiser regarding any Program, (c) negotiate any terms or conditions related to the Programs which may affect the rights,

protections, and/or obligations of a Yahoo! Entity, and/or that are inconsistent with the Agreement, or (d) engage in any telesales or telemarketing in connection with any Program, and (iv) Representative will perform its duties pursuant to the Agreement in a professional manner consistent with the requirements established by us. Upon our request, Representative will immediately deliver to us each agreement that designates Representative as the Advertiser's agent and authorizes Representative to act on the Advertiser's behalf in connection with the Agreement. In the event of a termination of your relationship with an Advertiser, such Advertiser may continue to use the Information, including account and performance history with respect to its ads, and Representative will no longer have API Access for such Advertiser's accounts. Representative will not at any time use data or information received in connection with the Agreement to conduct any marketing efforts targeted at our existing advertisers. While the Agreement is effective and for twelve (12) months thereafter, Representative will not, directly or indirectly, refer for employment or solicit our employees, consultants, or agents. **b. Payment Liability.** Without limiting any other provision of the Agreement, Representative and each Advertiser will be jointly and severally liable for all payment obligations pursuant to Section 2 of these Master Terms and Conditions, and you hereby waive any Law that may require us to proceed against one or more of you prior to proceeding against any others who may also be liable. Notwithstanding the foregoing, (i) if we offer you Sequential Liability in a particular country and we approve the applicable Advertiser's credit application, we will hold Representative liable for payments under Section 2, above, solely to the extent Representative has received payment from such Advertiser; for sums not received by Representative, we will hold the Advertiser solely liable ("**Sequential Liability**"), and (ii) if Representative (x) breaches or allegedly breaches Section 15a.(i), above, or (y) fails to comply with our request to confirm whether an Advertiser has paid to it in advance funds sufficient to make payments pursuant to Section 2, above, Representative will be obligated to immediately pay all such amounts due us regardless of whether it has received payment from such Advertiser. You acknowledge that we may directly contact any Advertiser represented by Representative, including if we have not received payment for such Advertiser's account within 60 days from the date of the applicable invoice.

16. **ELECTRONIC SIGNATURES EFFECTIVE. a.** If the Agreement is an electronic contract, then this Section applies in order to set out the legally binding terms of your use of our Programs, including the Yahoo! Company Websites. You accept the Agreement and the terms, conditions, and notices contained or referenced herein by clicking on the "I Accept" button in connection with your enrollment. This action creates an electronic signature that has the same legal force and effect as a handwritten signature. When you click on the "I Accept" button during enrollment, you also consent to having the Agreement provided to you in electronic form. **b.** You have the right to receive the Agreement in non-electronic form and may request a non-electronic copy of the Agreement before or after you electronically sign the Agreement by submitting a request to us as specified below. You also have the right, at any time, to withdraw your consent to have the Agreement provided to you in electronic form. Should you choose to withdraw your consent to have the Agreement provided to you in electronic form, we will discontinue your then-current username and password. This means that you will not have the right to use any Program unless and until we issue you a new username and password. We will only issue you a new username and password after we receive a signed copy of a non-electronic version of the Agreement, which we will send to you upon written request. To withdraw your consent and/or request a non-electronic copy of the Agreement, please send a letter and self-addressed, stamped envelope to the address set forth in Section 12, above. Your withdrawal of consent will be effective within a reasonable time after we receive your withdrawal notice described above. Prior to such effective date, the Agreement electronically signed by and provided to you will remain legally valid and enforceable. **c.** In order to access and retain the electronic Agreement, you must have access to the Internet, either directly or through devices that access web-based content, and pay any charges associated with such access. In addition, you must use all equipment necessary to make such connection to the Internet (e.g., a computer and modem or other access device). Please print a copy of the Agreement for your records. To retain an electronic copy of the Agreement, you may save it into any word processing program. We will notify you of any changes in the hardware or software requirements needed to access and/or

retain the Agreement that create a material risk that you will not be able to continue to access and/or retain the electronic Agreement.

**PAYMENT METHOD PROGRAM TERMS** – If you participate in the Payment Method Program in a particular country, the following Program Terms apply.

1. **BILLING AND PAYMENT METHOD.** When you supply us with a method of payment such as a credit card, charge card, or bank account ("**Payment Method**") in connection with a Program, you participate in the "**Payment Method Program**" and you authorize us to bill your Payment Method pursuant to these Payment Method Program Terms for any and all charges and fees you incur in connection with that Program, including recurring payments. The types of Payment Methods that we accept and the timing of the billing of the charges and fees may vary according to the Program and country; however, we do not knowingly accept debit cards and you should not provide a debit card as a form of payment. The terms of your Payment Method are determined by an agreement(s) between you and your financial institution.

2. **AUTHORIZATION.** You agree to keep your Payment Method information on file with us current (such as your address, card or account number, and expiration date, if any), and you also authorize us to update your Payment Method information with data we obtain from your financial institution, the issuer of your credit card or charge card, or from MasterCard or Visa. You authorize us to retain your Payment Method information until such time as you revoke this authorization in accordance with procedures prescribed by us. Any revocation by you of this authorization will become effective: (a) if your Payment Method is a credit or charge card, when all charges and fees associated with your use of the Programs have been fully satisfied, as determined by us; or (b) if your Payment Method is a bank account, after three (3) business days. Your revocation of this authorization will have no effect on your liability for charges and fees that you have incurred in connection with your use of a Program prior to such revocation.

3. **EFFECTS OF TERMINATION.** Sections 2 (third and fourth sentences) and 3 of these Payment Method Program Terms will survive any termination of the Agreement.

**PAYMENT PLAN PROGRAM TERMS** – If you participate in the Payment Plan Program in a particular country, the following Program Terms apply.

1. **PAYMENT METHODS.** If you use a Payment Plan, you authorize us to bill your Payment Method for all charges and fees in connection with each Program as specified by the Payment Plan you select ("**Payment Plan Program**"). Unless and until you or we discontinue your enrollment in a payment plan ("**Payment Plan**"), your preauthorization for billing your Payment Method is valid until the termination of the Agreement or the discontinuation of the Payment Plan by us or your participation therein. We will send a notification to the e-mail address associated with your Program account(s) after each preauthorized transaction to notify you that your account(s) has been replenished and your charges and fees have been paid. Such payments should appear on the periodic statement sent to you by the provider of your Payment Method. We reserve the right to modify, suspend, or terminate your right to prepay, any Payment Plan, and/or your participation therein at any time. If we modify a Payment Plan, notification will be posted on a Yahoo! Company Website or you will be notified by e-mail. If you do not consent to such modified terms, you may elect to discontinue your enrollment in a Payment Plan at any time by providing written notice to us before the effective date of such modified terms. Your non-termination or continued use of a Program reaffirms that we are authorized to bill your Payment Method automatically and constitutes your acceptance of the terms of any such modified terms. In connection with a Payment Plan, you agree that if your charges equal or exceed your payment, then your ads may be removed from the Distribution Network and you will incur a debit balance for the amount of any unpaid charges incurred under your account(s), including any amounts accrued prior to the time your ads are actually removed. Charges will be posted to your account and must be paid before any of your ads will be made available through the Distribution Network.

2. **TYPES OF PAYMENT PLANS.** "**Non-Stop Traffic Payment Plan**": Under the Non-Stop Traffic Payment Plan, you preauthorize us to periodically bill your Payment Method on a recurring basis for the amount you specify. Your Payment Method will automatically be billed with the preauthorized amount whenever your account has fewer than approximately the prior three (3) days' worth of charges remaining, as determined by us. The preauthorized amount then will be credited to your account and, after any debit balance that you may have incurred for charges in excess of the amount you have preauthorized is first deducted, the balance will be available to pay for future charges and fees; thus, while the amount charged to your Payment Method will remain the same throughout the term of your participation in the Non-Stop Traffic Payment Plan, the amount actually available in your account to pay for future charges and fees will vary depending upon the charges and fees you have incurred. "**Fixed Budget Payment Plan**": Under the Fixed Budget Payment Plan, you determine a monthly amount for charges to your Program account(s) and you preauthorize us to bill your Payment Method each month in the amount specified. Notwithstanding the monthly amount you specify, if you exceed your available balance in any month, you will incur a debit balance; this debit balance will be deducted from the amount next billed to your Payment Method and the remaining balance will be credited to your account to pay for future charges.

3. **EFFECTS OF TERMINATION.** None of the terms and conditions of these Payment Plan Program Terms will survive the termination of these Payment Plan Program Terms or the applicable Program Terms.

**API ACCESS PROGRAM TERMS** – If you participate in the API Access Program in a particular country, the following Program Terms apply.

1. **USE.** If we grant you API Access in connection with a Program(s) ("**API Access Program**"), API Access will be considered part of such Program(s). "**API Access**" is the ability, via the API Code, to access certain Program account information and/or features, and to execute commands for your Program account(s). You may not use your API Access, including any data obtained therefrom, for purposes other than managing your Program account(s) to which the API Access relates. In the event your use of a Program terminates, your API Access to such Program will terminate immediately. We may limit, modify, or terminate your API Access, in our discretion, at any time, and such modifications may require you to make changes, at your expense, to the API Code for continued API Access. "**API Code**" is software enabling API Access created by you or us using an XML/SOAP interface we specify. You may not use API Access pursuant to this section if you are party to another agreement with a Yahoo! Company that provides for such access.

2. **CODE.** If we give you Yahoo! Code, either the API Code itself or software to be incorporated into the API Code developed by you, we grant you a non-exclusive, revocable, non-transferable, non-sublicensable, limited, internal-use license to use the Yahoo! Code given to you by us solely for API Access. Upon our request, you will make the API Code available to us for our review, and notify us of the features and functionality of such API Code and the application to which the API Code connects. Your use of API Access must not place an unreasonable or disproportionately large load on our systems (as determined by us) or exceed access frequency limits set by us from time to time. If you are a Representative, this Section gives you, and not the Advertiser(s), API Access.

3. **EFFECTS OF TERMINATION.** None of the terms and conditions of the API Access Program Terms will survive the termination of these API Access Program Terms or the Program Terms of the Program for which you have been granted API Access.

**ANALYTICS PROGRAM TERMS** – If you participate in the Analytics Program in a particular country, the following Program Terms apply.

1. **USE.** We may provide you with Analytics in connection with a Program(s) for your use ("**Analytics Program**"). "**Analytics**" is Yahoo! Code for insertion on your webpages to

enable the analytical tools available for your account. Provided that you install Analytics, Yahoo! Code will be delivered into the Internet browser of visitors to your website(s) during their interaction with your website(s). Subject to the terms of the Agreement, we grant you a non-exclusive, revocable, non-transferable, non-sublicensable, limited, internal-use license for use with your Program account to use, execute, and display Analytics on your website. During the Analytics set-up process, we may append certain parameters to the URL associated with your ad to enable the Analytics Program. You may not edit or delete such parameters, which would prevent the proper functioning of Analytics and would render impaired or inaccurate results. In connection with the Analytics Program, you may not, directly or indirectly, transmit to a Yahoo! Entity any PII of the visitors to your website(s).

2. **YOUR WEBSITE.** While Analytics is on your website(s), you will: (i) obtain all rights and permissions necessary for the Yahoo! Entities to use the Analytics data, including statistical and traffic information collected by us and/or provided by you, as contemplated under the Agreement, and (ii) maintain and adhere to a privacy policy on your website(s) which must, at a minimum: (a) be available as a clear and conspicuous link from the main page of your website(s) and any other website page where visitors may provide PII, (b) comply with all applicable Laws, and (c) contain language materially similar to the following:

"We have contracted with Yahoo! to monitor certain pages of our website for the purpose of reporting web traffic, statistics, advertisement 'click-throughs,' and/or other activities on our website. No personally identifiable data is transferred to Yahoo! by us. Where authorized by us, Yahoo! may use cookies, web beacons, and/or other monitoring technologies to compile anonymous statistics about our website visitors. However, if you choose, you may opt out from Yahoo!'s collection of such information outside of the Yahoo! distribution network, by clicking on the following link: http://info.yahoo.com/privacy /us/yahoo/ ."

3. **EFFECTS OF TERMINATION.** Upon termination of these Analytics Program Terms or the Program Terms of the Program for which you have been provided Analytics, (i) you must promptly remove or have removed the Analytics from your website(s) and all items under your possession, custody, and/or control, and (ii) Section 2(i), above, will survive.

<u>DISPLAY ADVERTISING PROGRAM TERMS</u> – If you participate in the Display Advertising Program in a particular country, the following Program Terms apply.

1. **PROGRAM USE.** We provide you access to the Program for display advertising (**"Display Advertising Program"**) for your use. You will pay for all impressions and/or clicks on your ads that we deliver. **"Preemptible Ads"** are ads which are displayed on a space-available basis and are not guaranteed to appear in the Distribution Network, and are designated as such in an Insertion Order. Except with respect to Preemptible Ads, the last sentence of Section 5 of the Master Terms and Conditions does not apply to ads distributed under the Display Advertising Program. Except with respect to Preemptible Ads, we will use commercially reasonable efforts to deliver impressions in the amounts and locations by the end of the period specified in an Insertion Order, as applicable.

2. **PLACEMENT OF ADS.** If your Information, including any updates, is not given to us four (4) business days prior to its anticipated distribution or does not conform to our policies and specifications, we may distribute, at our option: (i) back-up ads based on Information you have previously given us or (ii) public service announcements of our choice, and bill you at the rates in the Insertion Order. We may optimize your campaign by modifying the line items of an Insertion Order. We must approve in advance in writing the serving of ads by anyone other than us. For ads in an Insertion Order that specify frequency caps, we will use commercially reasonable efforts to comply with such frequency caps, provided that you agree that we are not liable if your ads are viewed in excess of the frequency cap. For dynamically priced campaigns, we may adjust the location of, and price for, your ads in an effort to meet your target goals (e.g., CPC, CPA, or CPL).

3. **MAKE GOODS.** Except for Preemptible Ads, if we fail to deliver, by the end of the period specified in an Insertion Order, the aggregate number of impressions as agreed in the Insertion Order (subject to any reductions permitted under Section 2, above) or the impressions are delivered in the wrong location, then (i) for purposes of this Section 3 of the Display Advertising Program Terms only, the first sentence of Section 10 of the Master Terms and Conditions does not apply, and (ii) your sole and exclusive remedy is limited to the following, which we may choose in our discretion: (a) a refund of the charges representing the impressions that were undelivered or delivered to the wrong location, (b) delivery of the impressions at a later time in a comparable position as determined by us, and/or (c) an extension of the term of the Insertion Order with a refund representing any remaining undelivered impressions at the end of such extended term.

4. **TERMINATION; EFFECTS OF TERMINATION.** Notwithstanding Section 11 of the Master Terms and Conditions, you may not cancel an Insertion Order under this Display Advertising Program. If you terminate the Display Advertising Program Terms, all terms and conditions of these Display Advertising Program Terms will survive until such time as all Insertion Orders under this Program have ended. Sections 3 and 4 of these Display Advertising Program Terms will survive termination of these Display Advertising Program Terms.

**SPONSORED SEARCH and CONTENT MATCH® PROGRAM TERMS** – If you participate in the Sponsored Search Program and/or Content Match® Program in a particular country, the following Program Terms apply.

1. **USE.** We provide you access to our sponsored search Program and our Program for Content Match® ("**Sponsored Search Program**" and "**Content Match® Program**," respectively) for your use. "**Selected Ad Groups**" means the keywords you select, as well as certain misspellings, singular/plural combinations, and other related keywords that we may map to your ads based on the keywords, your ads themselves, and/or the websites to which the ads link (e.g., if you select the keyword "book," your ad may also appear in response to the keywords "books" or "buy books"). At a Yahoo! Entity's discretion, an ad may include a title, description, text, and/or graphics.

2. **PAYMENT.** In addition to any applicable service fees, you will pay for all clicks on your ads. Your bids are subject to the then-current minimum bid requirements for the Sponsored Search Program and/or Content Match® Program, as applicable. If you select the budgeting option (as may be available in connection herewith and modified by us from time to time), you will: (i) ensure that the amount you select for your approximate daily budget is reasonably related to the Selected Ad Groups you bid on, and the amounts you bid on such Selected Ad Groups; and (ii) promptly increase your approximate daily budget to an appropriate amount, if your daily budget does not comply with the foregoing.

3. **OPTIMIZATION.** In the U.S. only, for those advertisers not bound by an Insertion Order, we may help you optimize your account(s). Accordingly, you expressly agree that we may also: (i) create ads, (ii) add and/or remove keywords, and/or (iii) optimize your account(s). We will notify you via email of such changes made to your account(s), and can also include a spreadsheet of such changes upon your written request. If you would like any of such changes reversed, please reply to such email within 14 days of the change(s), and we will make commercially reasonable efforts to reverse the change(s) you specifically identify. Notwithstanding the foregoing, you remain responsible for all changes made to your account(s), including all click charges incurred prior to any reversions being made. It is your responsibility to monitor your account(s) and to ensure that your account settings are consistent with your business objectives.

4. **EFFECTS OF TERMINATION.** Sections 2, 3 (fifth sentence only), and 4 of these Sponsored Search and Content Match® Program Terms will survive termination of these Sponsored Search and Content Match® Program Terms.

5. **ADDITIONAL TERMS.** Yahoo! uses the Sponsored Search Program and/or Content

http://info.yahoo.com/legal/us/yahoo/advertising/gmaster/gmasterterms-322.html

Match® Program to advertise certain products and services.

**SEARCH SUBMIT PRO, PRODUCT SUBMIT, & TRAVEL SUBMIT PROGRAM TERMS** – If you participate in the Search Submit Pro, Product Submit, and/or Travel Submit Programs in a particular country, the following Program Terms apply.

1. **USE.** We provide you access to our search submit pro Program ("**Search Submit Pro Program**"), our product submit Program ("**Product Submit Program**"), and/or travel submit Program ("**Travel Submit Program**") for your use. **Product Submit Program only: "Categories"** and **"Subcategories"** mean the product categories you select and that we may map to your ads based on your ads themselves and/or the websites to which the ads link. We may re-categorize any incorrectly categorized ads (as determined by us) at any time.

2. **PAYMENT.** In addition to any applicable service fees, you agree to pay for all clicks on your ads. **Search Submit Pro Program and Travel Submit Program only:** We reserve the right to change the pricing and/or minimum monthly charge upon 30 days written notice to you, which may be provided by email. Subject to availability of advertising inventory, payment of higher fees, and any additional applicable terms, conditions, and/or policies, the display of certain ads may be enhanced through features that may be made available from time to time according to the applicable pricing schedule. **Product Submit Program only:** Your bids are subject to the then-current minimum bid requirements for the Product Submit Program.

3. **ADDITIONAL TERMS.** A "Feed Provider" means a third-party service provider of feed creation and/or feed optimization services which is provided by us and creates Information and/or optimizes ads on your behalf for inclusion in the Distribution Network. If you choose to use the feed creation and/or feed optimization services provided by a Feed Provider or us, then: (i) the Feed Provider and/or we will have the right to create Information and/or optimize the ads; (ii) such applicable Information and ads created and/or optimized by a Feed Provider or us may not be used for any non-Yahoo! Company service; and (iii) a Feed Provider will collect and provide to us: (a) data gathered from the applicable ads, and (b) conversion data gathered from such ads, provided that you install the necessary software to enable Analytics. ALL INFORMATION AND ADS CREATED OR OPTIMIZED BY A FEED PROVIDER AND/OR US ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTY, REPRESENTATION, CONDITION, OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, AND THAT YOUR USE THEREOF IS AT YOUR OWN RISK. Section 10 of the Master Terms and Conditions applies to any Feed Provider in connection with these Search Submit Pro, Product Submit, & Travel Submit Program Terms. **Travel Submit Program only:** If you or the Feed Provider submit Information, ads, or any portion thereof that do not comply with our requirements (including a failure to update the applicable Information) or are otherwise unacceptable, we may continue to use existing ads and Information.

4. **EFFECTS OF TERMINATION.** Upon termination of these Search Submit Pro, Product Submit, & Travel Submit Program Terms, your ads may remain in the Distribution Network for up to 15 days following termination. Sections 2, 3, and 4 of these Search Submit Pro, Product Submit, & Travel Submit Program Terms will survive termination of such Program Terms.

**LOCAL BASIC LISTINGS, LOCAL ENHANCED LISTINGS, & LOCAL FEATURED LISTINGS PROGRAM TERMS** – If you participate in the Local Basic Listings, Local Enhanced Listings, and/or the Local Featured Listings Programs (U.S. only), the following Program Terms apply.

1. **USE.** We provide you access to the Program for local basic ads ("**Local Basic Listings**"), local enhanced ads ("**Local Enhanced Listings Program**"), and/or Program for local featured ads ("**Local Featured Listings Program**") for your use. You must be a business located in the United States and selling goods and/or services at a physical business

location in the United States and/or in a service area surrounding the business address you provide to us. You may not participate in these Programs if you maintain a presence, or offer services, solely on the Internet. If you operate a business in more than one physical location or service area, you must run separate ads for each location or service area. You represent, warrant, and covenant that the ad(s) and Information for each location fairly and accurately describe the goods and/or services that you sell at that particular physical business location or within the service area surrounding your address, and that you have all necessary rights, permits, and licenses to offer for sale, sell, ship, and/or perform all products or services available through the businesses and websites identified in your ads, regardless of whether such products or services are described in your ads. You may not submit, or permit the submission of, multiple ads for the identical business. Unless we have provided you our express prior written approval, all Information you submit in connection with these Programs must be in English, and if your ad links to a website, the website must be in English, with the official business name visible to any visitor to your website. Ads will be categorized into the appropriate category(ies) and geography(ies) either by you or by us, provided that we may categorize or re-categorize any uncategorized or incorrectly categorized ads (as determined by us) at any time.

2. **PAYMENT.** In addition to any applicable service fees, you will be billed as specified in your online account(s) or in an Insertion Order. We reserve the right to change the pricing of these Programs at any time upon 30 days written notice to you, which may be provided by email.

3. **RATINGS AND REVIEWS.** We enable users to rate and provide written reviews on the business(es) listed in your ads, including the business' services and/or products, and such ratings and reviews will be publicly displayed. By participating in these Programs, you will be subject to such rating and review features, and we will have no liability in connection therewith nor any obligation to remove any reviews or ratings.

4. **MAPS.** We may use your address in an online map and will have no liability in connection therewith nor any obligation to remove any such information.

5. **EFFECTS OF TERMINATION.** Upon termination of these Local Basic Listings, Local Enhanced Listings, & Local Featured Listings Program Terms, your ads may remain in the Distribution Network for up to 30 days following termination. Sections 2, 3, 4, and 5 of these Local Basic Listings, Local Enhanced Listings, & Local Featured Listings Program Terms will survive termination of these Local Basic Listings, Local Enhanced Listings, & Local Featured Listings Program Terms.

**SPONSORSHIP PROGRAM TERMS** – If you participate in the Sponsorship Program in a particular country, the following Program Terms apply.

1. **USE AND DEFINITIONS.** We provide you access to our Program for product placements, exclusive placements, logo ads, and/or other sponsorship advertising ("**Sponsorship Program**") for your use. A "**Sponsorship**" is the sponsorship advertising campaign described in an Insertion Order or elsewhere. The terms and conditions of any advertising to promote the Sponsorship will be subject to an Insertion Order and the applicable Program Terms.

2. **FEES.** You agree that you will pay the Sponsorship fees specified in the applicable Insertion Order. If a line item of an Insertion Order for a Sponsorship specifies a number of ads, streams, impressions, or clicks, such number will be considered a minimum, and in the event of under-delivery of such minimum, the make good in Section 4 will apply.

3. **SPONSORSHIP DESIGN.** You acknowledge and agree that we are, and will at all times be, the "executive producer" of the Yahoo! Company Websites, and we will be responsible for the design, layout, look-and-feel, posting, and maintenance of any aspects of the Yahoo! Company Websites, including the display and performance of the Sponsorship; however, we may consult with you regarding the appearance of the Sponsorship prior to its display.

4. **MAKE GOODS.** We will use commercially reasonable efforts to deliver the Sponsorship as agreed in the Insertion Order. If we fail to deliver the Sponsorship as agreed in the Insertion Order or have under-delivered (if applicable), then (i) for purposes of this Section 4 of the Sponsorship Program Terms only, the first sentence of Section 10 of the Master Terms and Conditions does not apply, and (ii) your sole and exclusive remedy is limited to the following, which we may choose and value in our discretion: (a) a refund of the fees representing the portion of the Sponsorship that was undelivered or misdelivered, and/or (b) an extension of the term of the Sponsorship with a refund representing the portion of the Sponsorship that was undelivered or misdelivered at the end of such extended term.

5. **TERMINATION; EFFECTS OF TERMINATION.** Notwithstanding Section 11 of the Master Terms and Conditions, you may not cancel a Sponsorship or an Insertion Order related to a Sponsorship. In the event of a termination of these Sponsorship Program Terms, all terms and conditions of the Agreement will survive until such time as all Insertion Orders related to a Sponsorship have ended. Sections 3, 4, and 5 of these Sponsorship Program Terms will survive termination of these Sponsorship Program Terms.

**MICROSITE PROGRAM TERMS** -- If you participate in the Microsite Program (U.S. only), the following Program Terms apply.

1. **USE AND DEFINITIONS.** We provide you access to our Program for Microsites ("**Microsite Program**") for your use. A "**Microsite**" is the pages of the Yahoo! Company Website located at the URL listed in the Insertion Order or elsewhere. "**User Information**" means data voluntarily, directly, and expressly provided by a user during his/her use or interaction with the Microsite. "**Content**" is Information to be included or potentially included in the Microsite, as well as the derivative works of such (including content submitted and/or generated by users ("**User-Generated Content**")), including any and all audio, videos, data, images, files, hypertext links, scripts, trademarks, service marks, logos, and other distinctive brand features. The terms and conditions of any advertising to promote a Microsite will be subject to an Insertion Order and the applicable Program Terms.

2. **LICENSE GRANT.** In connection with the Microsite Program, you grant us a non-exclusive, royalty-free, worldwide license (and, if applicable, with respect to User-Generated Content, agree to obtain the foregoing from the creating and/or submitting user) to use, copy, sublicense, encode, store, archive, distribute via the Distribution Network, transmit, modify, translate, create teaser content of, render into an audible format, publicly display, and publicly perform the Content, in whole or in part.

3. **MICROSITE DESIGN.** We are, and will at all times be, the "executive producer" of the Yahoo! Company Websites, and we will be responsible for the design, layout, look-and-feel, posting, and maintenance of any aspects of the Yahoo! Company Websites, including the display and performance of the Content; however, we will consult with you regarding the appearance of the Microsite prior to its display. We may, at our discretion, include on the Microsite links to your privacy policy. We will display the links, attributions, copyright, or other proprietary notices (including trademark notices) you reasonably request in writing in connection with the display and/or performance of the Content, subject to our right to modify or exclude such links, attributions, and notices to the extent that we deem them impractical or inappropriate for the device on which the Content is intended to be reproduced, displayed, or performed. Except as may be set forth in an Insertion Order, we have no duty or obligation, express or implied, to post, host, stream, or otherwise include any Content on any Yahoo! Company Websites. Your use of the Microsite Program does not confer in us any right of ownership of the Content. You will deliver the Content and updates to the Content to us in accordance with our formatting, delivery, and technical specifications provided or made available to you by us until the earlier of the termination of the Microsite Program Terms or the date specified in the Insertion Order. You will provide ongoing assistance to us with regard to technical, administrative, and service-oriented issues relating to the use, encoding, transmission, and maintenance of the Content, as we may reasonably request.

4. **USE OF DATA.** If the Microsite receives any User Information, including PII, and we share such data with you, you represent, warrant, and covenant that (i) the User Information will be used, accessed, and maintained in strict compliance with all applicable Laws, your privacy policy, the user's authorization, and industry standard security specifications; (ii) if any user requests or we request on their behalf, you will immediately remove any PII relating to such user from your database or other records; (iii) you will not resell, disclose, transfer, or otherwise make available any PII; and (iv) you have reviewed our applicable Privacy Policy and that you will use commercially reasonable efforts to ensure that your use of User Information obtained in connection with a Microsite does not directly or indirectly cause us to violate any provision of our applicable Privacy Policy. User Information is owned by us and is our Confidential Information.

5. **TERMINATION; EFFECTS OF TERMINATION.** Notwithstanding Section 11 of the Master Terms and Conditions, you may not terminate a Microsite or an Insertion Order related to a Microsite. In the event of a termination of the Microsite Program Terms, all terms and conditions of these Microsite Program Terms will survive until such time as all Insertion Orders related to a Microsite have ended; provided, however, the grants and rights with respect to User-Generated Content described in Section 2, above, will not terminate. Sections 4 and 5 of these Microsite Program Terms will survive termination of these Microsite Program Terms.

**PROMOTION PROGRAM TERMS** – If you participate in the Promotion Program (U.S. only), the following Program Terms apply.

1. **GENERAL.** We provide you access to our contest, sweepstakes, coupon, special offer, or other promotion Program (**"Promotion Program"**) for your use. Each promotion described in an Insertion Order or elsewhere is a **"Promotion."** The terms and conditions of any advertising to promote a Promotion will be subject to an Insertion Order and the applicable Program Terms, and the terms and conditions of the Microsite associated with a Promotion will be subject to an Insertion Order and the Microsite Program Terms. Notwithstanding our approval or assistance in connection with a Promotion as may be specified in an Insertion Order or elsewhere, you are responsible for the Promotion(s), including the official rules, offer terms, or regulations governing a Promotion and the timely acquisition and fulfillment of all prizes, premiums, or discounts that may be offered in connection with a Promotion. Our approval of the official rules, offer terms, or regulations for any Promotion does not constitute an opinion as to the legal appropriateness, accuracy, or adequacy of those rules or their manner of use, nor a waiver of our indemnity rights under the Agreement.

2. **DATA.** User Information collected from a user in connection with registering for a Promotion is **"Promotion Registration Data."** User Information that is necessary for the fulfillment of any prizes, premiums, or discounts under a Promotion is **"Promotion Fulfillment Data."** Promotion Registration Data and Promotion Fulfillment Data are referred to collectively as **"Registration Data."** We grant you a limited, revocable, non-transferable license to use: (i) the Promotion Registration Data of those users who, during registration for a Promotion, agree to allow us to share their information with you and/or have specifically opted in to receive communications from you, provided that your use of such Promotion Registration Data is in accordance with your privacy policy linked from the Microsite where the User Information is collected, and (ii) the Promotion Fulfillment Data for the fulfillment of prizes, premiums, or discounts for that Promotion. Registration Data is owned by us and is our Confidential Information. In connection with a Promotion, you represent, warrant, and covenant that: (a) notwithstanding anything to the contrary in our or your applicable privacy policy, any Registration Data obtained in connection with a Promotion, including PII, will be used and maintained in strict compliance with the official rules of the Promotion, all applicable Laws, the user's authorization, and industry-standard security specifications; (b) if any user requests or we request on their behalf, you will immediately remove any PII relating to such user from your database or other records; (c) you will not resell, disclose, transfer, or otherwise make available any PII; and (d) you have reviewed our applicable Privacy Policy and that you will use

commercially reasonable efforts to ensure that your use of Registration Data obtained through a Promotion does not directly or indirectly cause us to violate any provision of our applicable Privacy Policy.

3. **TERMINATION.** Notwithstanding Section 11 of the Master Terms and Conditions, you may not cancel a Promotion or an Insertion Order related to a Promotion. If you terminate these Promotion Program Terms, all terms and conditions of these Promotion Program Terms will survive until such time as all Insertion Orders related to a Promotion have ended. Sections 1 (last sentence), 2, and 3 of these Promotion Program Terms will survive termination of these Promotion Program Terms.

* * *

**The Agreement, including the Master Terms and Conditions and Program Terms, was last updated on October 1, 2008.**

Copyright © 2008 Yahoo! Inc. All Rights Reserved.

Privacy | Legal

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROSETTA STONE LTD,

Plaintiff,

VS.

GOOGLE, INC.,

Defendant.

Civil No. 09-736

September 18, 2009

REPORTER'S TRANSCRIPT

MOTIONS HEARING

BEFORE: THE HONORABLE GERALD BRUCE LEE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: GIBSON DUNN & CRUTCHER, LLP
BY: TERENCE P. ROSS, ESQ.

FOR THE DEFENDANT: ODIN FELDMAN & PITTLEMAN, PC
BY: JONATHAN DAVID FRIEDEN, ESQ.
QUINN EMANUEL URQUHART OLIVER & HEDGES
BY: MARGRET MARY CARUSO, ESQ.

---

OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR,CRR
U.S. District Court
401 Courthouse Square, 5th Floor
Alexandria, VA 22314

1    from any program, website or property.

2                So whatever ability Rosetta Stone had to do

3    that technically or lawfully otherwise, they've now

4    agreed, just like they've agreed to bring any claims

5    relating to the program in California, not to do that.

6                So, these program terms are all required, do

7    govern the conditions of Rosetta Stone's participation,

8    but they're not limited just to that advertising

9    relationship.

10                THE COURT:  Thank you very much.

11                MS. CARUSO:  You're welcome, Your Honor.  If

12    you would like to hear more about the CDA, I can talk

13    about that.

14                THE COURT:  I'm trying to be polite.  When I

15    say thank you very much, that means that I think I

16    understand your position.

17                MS. CARUSO:  Okay.

18                The --

19                THE COURT:  In California, that -- in

20    Virginia, that means the judge has heard enough.

21                MS. CARUSO:  Thank you very much, Your

22    Honor.

23                THE COURT:  Thank you.

24                This matter is before the Court on the

25    defendant's motion to dismiss.  And the parties have

1    properly briefed the matter, and there are, I think, three

2    critical issues, and the first that has to be decided at

3    the outset is whether or not this lawsuit belongs in

4    Virginia under the forum selection clause of the AdWords

5    contract submitted by Google.

6              And, of course, such clauses are enforceable

7    under Virginia law and federal law.  And what we're

8    dealing with here is terms that are set forth in the

9    AdWords program contract in paragraph nine.

10             And both parties have briefed the matter.

11    So, I have to, as I am supposed to, determine if the

12    clause is clearly communicated to the other side, whether

13    it's mandatory permissive, whether the claims involved are

14    subject to the clause, and whether the resisting party has

15    rebutted the presumption of enforceability under the

16    *Phillips versus Audio Active* case.

17             Obviously, the first and the second are met

18    because the clause is obvious and it is, I think, a

19    mandatory clause.  And it was communicated electronically

20    to the Rosetta Stone's marketing manager.

21             And as it relates to the issue of whether or

22    not the claims are subject to forum selection clause, I

23    hold that they are not, because none of the claims concern

24    Rosetta Stone's participation in Google's advertising

25    programs.

1    Three of the claims concern Virginia

2  business law, and five are based on the Lanham Act.

3    Obviously, the *Yahoo* case from the Fifth

4  Circuit is not controlling.  But in that case, the Fifth

5  Circuit upheld District Court's judgment to not enforce a

6  forum selection clause because the clause in that case

7  required American Airlines to submit claims to California

8  forums and claims brought by Yahoo against it and the

9  clause is ambiguous.  And the claims between American

10  Airlines and Yahoo arose out of different circumstances.

11    Here what we're dealing with is a trademark

12  infringement claim that could have been brought

13  notwithstanding the contract.  The cause of action do not

14  turn on the contractual relationship between Google and

15  Rosetta Stone.

16    The claims arguably turn on Google's

17  relationship with other advertisers, that is to say the

18  relationship that Google has with other advertisers who

19  are being presented on the website as sponsored links.

20  And if that's an independent relationship between Google

21  and Rosetta Stone, obviously, the facts would be different

22  if Rosetta Stone brought a breach of contract claim which

23  would require interpretation of the AdWords contracts.

24    So, because the claims are not subject to

25  forum selection clause, I'm going to deny the motion to

1    dismiss as it relates to the forum selection clause.

2              That brings us to the false representation

3    claim under 12(b)(6).  Obviously, I'm applying *Bell*

4    *Atlantic versus Twombly* and *Ashcroft versus Iqbal*.  And it

5    seems to me that I'm going to grant the motion to dismiss

6    as it relates to the false representation of the so-called

7    false endorsement claim because the plaintiff here has not

8    sufficiently asserted that there is a likelihood of

9    consumer confusion as to the origin, approval or

10   endorsement of the product under the *Comins* -- and *Comins*

11   is C-O-M-I-N-S *versus Discovery Communication* case.

12             And I think that a false endorsement claim

13   can be viable even if the parties are not competitors

14   under the *Holland versus Psychological Assessment* case.

15             But what we have here is a failure to, I

16   think, sufficiently set forth a likelihood of confusion as

17   it is required in the Fourth Circuit under the *Synergistic*

18   case.  And *Synergistic* is spelled S-Y-N-E-G-I-S-T-I-C

19   case, Fourth Circuit, 2006.

20             Focusing on the seventh factor which is

21   actual confusion, while the plaintiff sets forth

22   background about the information on the Internet, Google

23   Search Engine being based on keyword "advertising", I do

24   not think that they sufficiently set forth a showing that

25   would demonstrate confusion by web users or confusion by

1   web users that would allow web users to think that

2   sponsored link means that Rosetta Stone somehow endorses

3   the link.

4           I think that it has -- sponsored links means

5   arguably paid ads, not necessarily ads paid by or approved

6   or endorsed by Rosetta Stone.  And obviously, I give

7   Rosetta Stone a chance to revisit if they want to replead

8   that.  But I'm going to grant the motion as it relates to

9   the false endorsement claim.

10          As it relates to the issue of whether the

11  conspiracy claim is encompassed in the immunity afforded

12  by the Communications Decency Act, depending upon the

13  status of Google, I think that Google is an interactive

14  computer service provider.  And there's no indication here

15  that Google creates the contents of the ads.

16          I understand the theory about the banners

17  and the headings.  And I think my Neiman Ford -- Neiman

18  Chevrolet case address something about the banners and

19  headings.  But in any event, I do not think that is

20  sufficient to plead that Google would fall outside the

21  Communications Decency Act's immunity.

22          Rosetta Stone has cited to the *Fair Housing*

23  *Council of San Fernando Valley* case, and I think that that

24  case is distinguishable in about three ways.

25          First, the Roommates.com requires an

interested member to complete a questionnaire. Second,

Roommates.com sends out e-mails containing member's

profile to other members; and third, information provided

by Roommates.com members in a comment box are displayed

for others to view.

In that case, the Court found that

Roommates.com is an information content provider because

as to the contents of the questionnaire and the e-mail

distribution, its content ads formulated by Roommates.

Here, Google is displaying its sponsored

links based upon the web user query. And a web user has

to decide to use Google. It's open. It's the marketplace

on the web. It's not the only game in town. Obviously

there is Yahoo and Bing, B-I-N-G and others.

So, the displaying of a formatted

advertising is passive. It's not the same as sending out

e-mails and soliciting private information which is shared

with others. And similarly the *800-JR Cigar* case is

distinguishable in at least two ways.

First the Court did not determine whether

the defendant's conduct made it an information content

provider. Rather it found that the defendant does not

qualify as an interactive computer service provider.

And second, the Court held that immunity was

inapplicable because the alleged fraud is use of the

1    plaintiff's trademark in the advertiser's bidding process,

2    not necessarily adds information from the third party that

3    may appear on the search results page.

4                    So, seems to me that Rosetta Stone's claims

5    turn on the Google's relationship with other paid

6    advertisers regarding the use of Rosetta Stone's marks.

7                    And since the purpose of the CDA is not to

8    shield parties from fraud or abuse, arise from their own

9    pay for priority advertisement but from the actions of

10   third parties, it is applicable for this case.

11                   For those reasons, I'm going to grant the

12   motion to dismiss as it relates to Count VIII.

13                   Thank you for the quality of your

14   preparation and your patience.

15                   We're in recess.

16                   (Proceedings concluded at 1:11 p.m.)

17

18

19

20

21

22

23

24

25

# EXHIBIT C

1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ROBOCUT, INC.,                              No. C-04-0979 MMC

12          Plaintiff,                           **ORDER DENYING MOTION FOR**
                                                 **PRELIMINARY INJUNCTION;**
13   v.                                          **VACATING HEARING**

14   FLOWBEE INTERNATIONAL, INC.,                (Docket Nos. 7, 12)

15          Defendant.
     _____/
16

17          Before the Court is defendant and counterclaimant Flowbee International, Inc.'s

18   ("Flowbee") motion, filed April 15, 2004, for a preliminary injunction against trademark

19   infringement by plaintiff and counterdefendant RoboCut, Inc. ("RoboCut").  The Court,

20   having reviewed the papers filed in support of and in opposition to the motion finds the

21   matter appropriate for decision without oral argument, see Civil L.R. 7-1(b), and hereby

22   VACATES the June 11, 2004 hearing date.  For the reasons set forth below, the Court

23   DENIES the motion.

24                                **BACKGROUND**

25          RoboCut and Flowbee sell competing vacuum haircutting products.  The parties

26   dispute the legality of RoboCut's use of the "Flowbee" mark in selling, over the Internet,

27   haircutting products made by both parties.

28          On March 10, 2004, RoboCut filed the instant action against Flowbee, seeking a

1 declaratory judgment that it is not infringing Flowbee's trademark or violating laws against

2 unfair competition or false advertising. On April 15, 2004, Flowbee answered the complaint

3 and filed counterclaims against RoboCut and third-party defendant Alfred Natrasevchi

4 ("Natrasevchi"), RoboCut's founder and president, for trademark infringement, false

5 designation of origin, cyberpiracy, dilution, common law trademark infringement, and

6 statutory and common law unfair competition.

7      Flowbee has been selling a patented, vacuum haircutter throughout the United

8 States under the "Flowbee" trademark since 1987. (See Hunts Decl. ¶ 2.) Since 1988,

9 Flowbee has owned a registered trademark in the word "Flowbee" for use on hair clippers.

10 (See Townsend Decl. Ex. A; Hunts Decl. ¶ 3.)

11      RoboCut developed, filed a patent on, and started marketing its vacuum haircutter in

12 1986. (See Natrasevschi Decl. ¶ 3.) RoboCut operates several websites that are

13 dedicated to selling vacuum haircutters and their accessories, through which RoboCut sells

14 its own products in addition to Flowbee products that RoboCut has purchased directly from

15 Flowbee and through distributors. (See id. ¶ 5.) One of the features of RoboCut's websites

16 is a page dedicated to comparing and contrasting the features of RoboCut's product with

17 those of Flowbee's product ("comparative advertising page"). (See id. ¶ 7 and Ex. 2.)

18 Since March 2003, RoboCut has sold more than 1200 Flowbee products through

19 RoboCut's websites. (See id. ¶ 6.)

20      In mid-February 2004, Flowbee's president, Rick Hunts, learned that RoboCut was

21 operating a website at www.betterthanflowbee.com and that RoboCut was offering for sale

22 on that website a product called the "Better Than Flowbee Deluxe." (See Hunts Decl. ¶ 4;

23 Hunts 5/28/04 Decl. ¶ 5.) According to Hunts, the "Better Than Flowbee Deluxe" was a

24 RoboCut product, and not a genuine Flowbee product. (See Hunts Decl. ¶ 4; Hunts

25 5/28/04 Decl. ¶ 5.) Upon further examination of the website, Hunts discovered that

26 RoboCut sites used the term "flowbee" in its metatags. (See Hunts Decl. ¶ 4.) Flowbee's

27 counsel sent a cease-and-desist letter to RoboCut. (See id.)

28      RoboCut's counsel immediately entered into negotiations with Flowbee's counsel

2

1   with regard to the manner in which RoboCut could use the Flowbee mark in RoboCut's

2   internet advertising.  (See Kronenberger Decl. ¶ 3.)  As a result of those negotiations,

3   RoboCut (1) stopped using and deactivated the domain name betterthanflowbee.com, (2)

4   removed the word "Flowbee" from the metatags on all of RoboCut's websites, (3) made

5   changes to the text on the home page and comparative advertising page of RoboCut's

6   main website, and (4) created a detailed legal disclaimer regarding the relationship

7   between RoboCut and Flowbee.  (See id. ¶ 3.)

8        After these changes, "the only references to the word 'Flowbee' on the home pages

9   of RoboCut's websites were (1) the phrase 'Flowbee Compared,' which linked to the

10  comparative advertising page, (2) the use of the word 'Flowbee' in the . . . legal disclaimer,

11  . . . and (3) in links and on pages facilitating the purchase of Flowbee products."  (See id.

12  ¶ 4.)  RoboCut also continues to use the word "Flowbee" in the comparative advertising

13  page of RoboCut's websites.  (See id.)

14       Through Internet search engine advertising programs like Google's AdWords and

15  Yahoo's Overture, RoboCut also "bids on" combinations of search words that include the

16  Flowbee mark.  (See id.)  As a result, when Internet users search for the word "Flowbee,"

17  alone or in combination with other search terms, RoboCut advertising appears among other

18  search results.  (See id.; see also Hunts Decl. Exs. A, C.)  RoboCut's advertisements

19  include the Flowbee name, and when an advertisement is clicked on, Internet users are

20  taken to RoboCut web pages where Flowbee products, as well as RoboCut products, are

21  sold.  (See Kronenberger Decl. ¶ 4; see also Natrasevschi Decl. ¶¶ 5, 7.)  One such

22  advertisement from Google.com appears at Exhibit A to the Hunts Declaration, filed

23  April 15, 2004, and states, in its entirety:

24          Flowbee $49.99 Sale
            RoboCut $44.99 for extra precision.
25          Free exchange.  Ships today.
            www.haircut.com/compare.html
26

27  (See Hunts Decl. Ex. A.)  Another such advertisement from Yahoo.com appears at

28  Exhibit C to that declaration, and states, in its entirety:

1
> Flowbee $49.99 Super Sale – RoboCut $44.99 extra precision.
> Free system exchange. Money-back guarantee. Ships today.
2
> www.robocut.com

3   (See Hunts Decl. Ex. C.)  Another such advertisement from Google.com appears at Exhibit

4   D to the May 28, 2004 Hunts Declaration (hereafter "Hunts May 28, 2004 Decl."), and

5   states, in its entirety:

6
> Flowbee – in stock.
> www.haircut.com/compare.html $44.99 RoboCut.  Total warranty.  Free
7
> exchange. Ships to

8   (See Hunts May 28, 2004 Decl. Ex. D.)

9        Flowbee moves for a preliminary injunction, based solely on its claim for trademark

10   infringement.  Flowbee seeks an order enjoining RoboCut from "purchasing from Internet

11   search engines the keyword 'flowbee' or any name, mark or word confusingly similar to

12   [Flowbee's] FLOWBEE mark" and from "using or publishing the mark or term FLOWBEE on

13   its Web Site(s) in HTML searchable code in a manner searchable by Internet search

14   engines."  (See Proposed Order Granting Counterclaimant's Motion for Preliminary

15   Injunction at 2.)  RoboCut's use of the betterthanflow.com website, its prior sale of the

16   "Better than Flowbee Deluxe" model, and its use of the word "flowbee" in metatags are not

17   at issue in Flowbee's instant motion for preliminary injunction.

18                                      **LEGAL STANDARD**

19        "[A] preliminary injunction is an extraordinary and drastic remedy, one that should

20   not be granted unless the movant, by a clear showing, carries the burden of persuasion."

21   See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotation and citation

22   omitted) (emphasis in original).   A plaintiff is entitled to a preliminary injunction when the

23   plaintiff demonstrates either (1) a combination of probable success on the merits and the

24   possibility of irreparable injury or (2) the existence of serious questions going to the merits

25   and that the balance of hardships tips sharply in the plaintiff's favor.  See Brookfield

26   Communications v. West Coast Entertainment Corp., 174 F. 3d 1036, 1046 (9th Cir. 1999).

27                                        **DISCUSSION**

28        The Lanham Act provides that "[a]ny person who shall, without the consent of the

1  registrant . . . use in commerce any . . . copy . . . of a registered mark in connection with the
2  sale, offering for sale, distribution, or advertising of any goods or services on or in
3  connection with which such use is likely to cause confusion, or to cause mistake, or to
4  deceive . . . shall be liable in a civil action by the registrant[.]"  See 15 U.S.C. § 1114(1).
5  "The core element of trademark infringement is the likelihood of confusion, i.e., whether the
6  similarity of the marks is likely to confuse customers about the source of the products."
7  Brookfield Communications, 174 F.3d at 1053 (citations omitted).

8      The following factors, frequently referred to as the Sleekcraft factors, see AMF, Inc.
9  v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), are often relevant in determining
10  the likelihood of confusion: "similarity of the conflicting designations; relatedness or
11  proximity of the two companies' products or services; strength of [the plaintiff's] mark;
12  marketing channels used; degree of care likely to be exercised by purchasers in selecting
13  goods; [the defendant's] intent in selecting its mark; evidence of actual confusion; and
14  likelihood of expansion in product lines."  See Brookfield Communications, 174 F.3d at
15  1053-54. The Ninth Circuit has noted, however, that "[a]lthough some factors -- such as the
16  similarity of the marks and whether the two companies are direct competitors -- will always
17  be important, it is often possible to reach a conclusion with respect to likelihood of
18  confusion after considering only a subset of factors." See id. at 1054. Courts "must be
19  acutely aware of excessive rigidity when applying the law in the Internet context; emerging
20  technologies require a flexible approach." See id.

21      The instant action is not a typical trademark case, where the defendant is alleged to
22  identify its goods with a mark that is confusingly similar to the plaintiff's mark. Here,
23  RoboCut is using the Flowbee mark to draw customers to a RoboCut website that
24  compares the features of the Flowbee and RoboCut products, and offers both products for
25  sale.

26      **A. RoboCut's Right to Sell Flowbee Products Under First Sale Doctrine**
27      There is no allegation that RoboCut is illicitly obtaining Flowbee's products for
28  resale. RoboCut attests that it bought Flowbee's products on the open market from

1   distributors and from Flowbee itself.  (See Natrasevschi Decl. ¶ 5.)  The Ninth Circuit has

2   held that "the right of a producer to control distribution of its trademarked product does not

3   extend beyond the first sale of the product."  See Sebastian International, Inc. v. Longs

4   Drug Stores Corp., 53 F.3d 1073 (9th Cir. 1995).  "Resale by the first purchaser of the

5   original article under the producer's trademark is neither trademark infringement nor unfair

6   competition," even when the producer has not authorized the reseller to sell the producer's

7   products.  Id.  The first sale doctrine applies even when resale under the producer's

8   trademark creates a likelihood of consumer confusion; "[t]he 'first sale' rule is not rendered

9   inapplicable merely because consumers erroneously believe the reseller is affiliated with or

10  authorized by the producer."  See id. at 1075-76.  Consequently, RoboCut undeniably has

11  the legal right to sell Flowbee's products that RoboCut has lawfully purchased on the open

12  market.  Flowbee does not argue otherwise.

13      Nevertheless, "conduct by the reseller other than merely stocking and reselling

14  genuine trademarked products may be sufficient to support a cause of action for

15  infringement."  Id. at 1076.  As the Ninth Circuit has noted, for example, in Bandag, Inc. v.

16  Al Bolser's Tire Stores, 750 F.2d 903 (Fed. Cir. 1984), "the reseller used the producer's

17  trademark in a telephone directory advertisement in such a way as to suggest the reseller

18  was one of the producer's franchisees."  See Sebastian, 53 F.3d at 1076.  Here, however,

19  RoboCut's website expressly states, in bold type:

20      Flowbee® is a registered trademark of Flowbee International, which is not
        affiliated with RoboCut, Inc. RoboCut Inc. is neither a franchisee nor part of
21      the authorized sales force of Flowbee International.  RoboCut, Inc. is merely
        an online retailer of the Flowbee product.
22

23  (See Natrasevschi Decl. Ex. 2.)  There is no evidence that RoboCut uses the Flowbee

24  mark in a manner that is likely to mislead consumers into believing that RoboCut is an

25  authorized Flowbee retailer.

26      **B. RoboCut's Use of Flowbee Mark in Comparative Advertising**

27      RoboCut also uses Flowbee's mark in comparative advertising.  The Ninth Circuit

28  has held that "competitors may use a rival's trademark in advertising and other channels of

6

1   communication if the use is not false or misleading." See New Kids on the Block v. News
2   America Publishing, Inc., 971 F.2d 302, 307 (9th Cir. 1992).  Such uses "are best
3   understood as involving a non-trademark use of a mark – a use to which the infringement
4   laws simply do not apply[.]"  See id.  "[W]here the defendant uses a trademark to describe
5   the plaintiff's product . . . a commercial user is entitled to a nominative fair use defense
6   provided that [it] meets the following three requirements: First, the product or service in
7   question must be one not readily identifiable without use of the trademark; second, only so
8   much of the mark or marks may be used as is reasonably necessary to identify the product
9   or service; and third, the user must do nothing that would, in conjunction with the mark,
10   suggest sponsorship or endorsement by the trademark holder."  Id. at 308.  The Ninth
11   Circuit has held that where, as here, a defendant raises a nominative fair use defense, the
12   above-stated three-factor test should be applied rather than the test for likelihood of
13   confusion set forth in Sleekcraft.  See Playboy Enterprises, Inc. v. Welles, 279 F.3d 796,
14   801 (9th Cir. 2002).

15         In the instant case, it is difficult to imagine how one would refer to the Flowbee
16   product without using the Flowbee mark, particularly since Flowbee is not the only
17   manufacturer of a vacuum haircutting system.  Accordingly, the first element has been
18   satisfied.  The evidence shows that RoboCut uses the Flowbee mark only to identify the
19   Flowbee product and to distinguish its own products from Flowbee products, and uses only
20   the word "Flowbee" in its Internet search advertisements and comparative advertising page,
21   not any distinctive Flowbee packaging or graphics.  Thus, the second element also has
22   been met.  Finally, there is no evidence that RoboCut has used the mark in a manner that
23   suggests sponsorship or endorsement by Flowbee; to the contrary, RoboCut's website
24   includes a disclaimer, in bold type, expressly stating that RoboCut has no affiliation with
25   Flowbee.

26         In addition, in order for RoboCut to avoid liability for trademark infringement for its
27   use of the Flowbee mark in comparative advertising, the comparative advertising must be
28   truthful.  See SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd., 592 F.2d 1096, 1103

1    (9th Cir. 1979) (holding "use of a competitor's trademark for purposes of comparative

2    advertising is not trademark infringement so long as it does not contain misrepresentations

3    or create a reasonable likelihood that purchasers will be confused as to the source, identity,

4    or sponsorship of the advertiser's product") (internal quotation and citation omitted).

5    Although Flowbee alleges in its counterclaim that RoboCut's comparative advertising

6    contains false statements about Flowbee's product (see Counterclaim ¶ 29), Flowbee has

7    submitted no evidence that any of RoboCut's comparisons between its product and the

8    Flowbee product are false. By contrast, RoboCut's founder and president, Natrasevschi,

9    attests that the statements RoboCut has made in its comparative advertising are based on

10    facts taken from Flowbee's product manual and Flowbee's website, www.flowbee.com.

11    (See Natrasevschi Decl. ¶ 3.) Consequently, Flowbee has not established a likelihood of

12    success on the merits of its claim that RoboCut's advertising contains false statements

13    about Flowbee.

14    **C. RoboCut's Use of the Flowbee Mark to Link to Internet Advertisements**

15    The test for nominative fair use also is applicable as a defense to trademark

16    infringement based on allegedly unlawful use of a trademark as a link to advertisements on

17    an Internet search engine. See Playboy Enterprises, Inc. v. Netscape Communications

18    Corp., 354 F.3d 1020, 1029-1030 (9th Cir. 2004) ("Playboy v. Netscape"). The Ninth Circuit

19    describes this practice as "keying" and notes that "[k]eying allows advertisers to target

20    individuals with certain interests by linking advertisements to pre-identified terms." See id.

21    at 1022. For example, "a seed company might pay to have its advertisements displayed

22    when searchers enter terms related to gardening." See id. at 1023.

23    In Playboy v. Netscape, the defendant required adult-oriented companies to link their

24    ads to a set of words that included the plaintiff's "playboy" and "playmate" marks. See id.

25    Thus, when an Internet search was conducted for "playboy," for example, advertisements

26    were displayed for companies in the adult entertainment industry that had no connection to

27    the plaintiff. See id. The Ninth Circuit found that the nominative fair use doctrine had no

28    application to the facts of that case, because there was no need to use the plaintiff's

8

1  trademarks to advertise the products or services of unrelated companies. See id. at 1030.

2  The court further found that a material dispute of fact existed, precluding summary

3  judgment, on the plaintiff's claim for trademark infringement, based on a theory of "initial

4  interest confusion." See id. at 1024-25, 1031.

5       "Initial interest confusion is customer confusion that creates initial interest in a

6  competitor's product." Id. at 1025. "Although dispelled before an actual sale occurs, initial

7  interest confusion impermissibly capitalizes on the goodwill associated with a mark and is

8  therefore actionable trademark infringement." Id. For example, even if a customer who

9  clicks on an advertisement linked to the term "playboy" realizes immediately that they have

10  entered a site unrelated to Playboy Enterprises, Inc., "the damage has been done:

11  Through initial consumer confusion, the competitor 'will still have gained a customer by

12  appropriating the goodwill that [Playboy] has developed in its mark.'" See id. (quoting

13  Brookfield, 174 F.3d at 1057).

14       In Playboy v. Netscape, the Ninth Circuit specifically noted that it was "not

15  addressing a situation in which advertisers or defendants overtly compare [the plaintiff's]

16  products to a competitor's[.]" See id. at 1030. Also not at issue in Playboy v. Netscape

17  was the situation where the defendant's use of the plaintiff's mark was to trigger the listing

18  of sites that legitimately use the plaintiff's marks. See id. Both of these issues are present

19  in the instant case.

20       In the instant case, Flowbee, on the current record, has not shown initial interest

21  confusion, because when a customer, after searching for the term "Flowbee," clicks on one

22  of RoboCut's Internet advertisements, that customer is taken to a page wherein he or she

23  is provided an opportunity to purchase Flowbee products. As noted above, RoboCut has

24  the right to resell Flowbee products, and on the evidence before the Court, RoboCut's

25  comparison of Flowbee and RoboCut products is not inaccurate. As a lawful seller of

26  Flowbee products, RoboCut has the right to use the Flowbee mark to sell Flowbee products

27  and to accurately compare Flowbee and RoboCut products. The Court also notes that

28  RoboCut's price for the Flowbee product is competitive with the price Flowbee itself

1    charges (See Hunts Decl. ¶¶ 3, 5), and that RoboCut's website makes it equally easy for a

2    potential customer to purchase Flowbee or RoboCut products, thus suggesting that

3    RoboCut's offer to sell Flowbee products is in good faith. Consequently, based on the

4    evidence currently before the Court, an Internet user who clicks on one of RoboCut's ads is

5    neither misled nor confused.

6        On the evidentiary record currently before the Court, RoboCut has established a

7    nominative fair use defense to Flowbee's claim of trademark infringement, as RoboCut is

8    currently using the Flowbee mark only to sell Flowbee products and to advertise the

9    differences between the Flowbee and RoboCut products.[1] Accordingly, Flowbee has failed

10    to demonstrate either a likelihood of success on the merits or the existence of serious

11    questions going to the merits. Even assuming, _arguendo_, a sufficient showing as to the

12    latter, Flowbee has made no showing as to the balance of hardships.

13                    **CONCLUSION**

14        For the reasons set forth above, Flowbee's motion for a preliminary injunction is

15    hereby DENIED.

16        This order terminates Docket Nos. 7 and 12.

17    **IT IS SO ORDERED.**

                                  /s/ Maxine M. Chesney

18    Dated: June 8, 2004                  MAXINE M. CHESNEY

                                  United States District Judge

19

20

21

22

23

24

25

26

---

27        [1] In light of this conclusion, the Court does not reach RoboCut's argument that
Flowbee is precluded from obtaining injunctive relief against RoboCut under the doctrine of

28    unclean hands.

# EXHIBIT D

1 | KRONENBERGER & ASSOCIATES
Karl S. Kronenberger (Bar No. 226112)
2 | 220 Montgomery Street, Suite 1920
San Francisco, CA 94104
3 | Telephone: (415) 955-1155
Facsimile: (415) 955-1158

4

Attorneys for Plaintiff and Counterdefendant
5 | ROBOCUT, INC.

6 | LAWRENCE G. TOWNSEND  (SBN 88184)
LAW OFFICES OF LAWRENCE G. TOWNSEND
7 | 455 Market Street, 19th Floor
San Francisco, California 94105
8 | Telephone: (415) 882-3288
Facsimile: (415) 882-3299

9

Attorneys for Defendant, Counterclaimant and Third-Party
10 | Plaintiff FLOWBEE INTERNATIONAL, INC.

11 |                    UNITED STATES DISTRICT COURT

12 |                    NORTHERN DISTRICT OF CALIFORNIA

13

ROBOCUT, INC., a Colorado corporation,      )   Case No. C 04 0979 MMC
14 |                                         )
                        Plaintiff,          )   **STIPULATION AND ORDER RE**
15 |                                         )   **DISMISSAL OF ENTIRE ACTION**
         vs.                                )
16 |                                         )
FLOWBEE INTERNATIONAL, INC., a              )
17 | California corporation,                 )
                                            )
18 |                        Defendant.       )
                                            )
19 |                                         )
FLOWBEE INTERNATIONAL, INC., a              )
20 | California Corporation,                 )
                                            )
21 |   Counterclaimant and Third-Party Plaintiff, )
                                            )
22 |         vs.                             )
                                            )
23 | ROBOCUT, INC., a Colorado corporation,  )
                                            )
24 |   Counterdefendant                      )
                                            )
25 | and                                     )
                                            )
26 | ALFRED NATRASEVCHI,                     )
                                            )
27 |   Third-Party Defendant.                )
                                            )
28

1

Stipulation and Order re Dismissal; Case No.: C 04 0979 MMC

1        Pursuant to F.R.C.P. 41(a)(l)(i), the parties herein, by and through their counsel of record,

2  hereby stipulate that the entire action, including the complaint, counterclaim and third-party

3  complaint, be dismissed with prejudice.

4

5  Dated:  November 23, 2004        KRONENBERGER & ASSOCIATES

6

7

8                          By:    /s/ Karl S. Kronenberger
                                  Karl S. Kronenberger
                                Attorney for Plaintiff and Counterdefendant

9                                ROBOCUT, INC.

10

11  Dated:  November 23, 2004        LAW OFFICES OF LAWRENCE G. TOWNSEND

12

13

14                         By:       /s/ Lawrence G. Townsend
                                  Lawrence G. Townsend
                                Attorneys for Defendant and Counterclaimant

15                                FLOWBEE INTERNATIONAL, INC.

16

17

18  **IT IS SO ORDERED.**

19

20  Dated:  November 29, 2004

21                                Maxine M. Chesney

22                                  United States District Judge

23

24

25

26

27

28

APPROVED
Judge Maxine M. Chesney

<div align="center">2</div>

# EXHIBIT E

```
1                IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                      CORPUS CHRISTI DIVISION

3

FLOWBEE INTERNATIONAL, INC.,      *    CIVIL ACTION
4   AND FLOWBEE HAIRCUTTER LIMITED    *
    PARTNERSHIP,                      *    CA-C-09-199
5                                     *
              PLAINTIFFS,             *
6                                     *
    VS.                               *
7                                     *    CORPUS CHRISTI, TEXAS
    GOOGLE, INC.,                     *    SEPTEMBER 23, 2009
8                                     *    1:08 P.M.
              DEFENDANT.              *
9                                     *
    * * * * * * * * * * * * * * * * *

10

11           TRANSCRIPT OF INITIAL PRETRIAL CONFERENCE

12           BEFORE THE HONORABLE JANIS GRAHAM JACK
                     UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:        MR. DAVID TARRANT BRIGHT
                                WATTS, GUERRA & CRAFT, L.L.P.
16                              555 NORTH CARANCAHUA, SUITE 1400
                                CORPUS CHRISTI, TEXAS 78478
17
     FOR THE DEFENDANT:         MS. MARGARET CARUSO
18                              QUINN, EMANUEL, URQUHART, OLIVER &
                                HEDGES, L.L.P.
19                              555 TWIN DOLPHIN DRIVE, SUITE 560
                                REDWOOD SHORES, CALIFORNIA 94065
20
                     (APPEARANCES CONTINUED ON PAGE 2)
21

22   COURT RECORDER:           MS. VELMA GANO

23
            PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
24            TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                   MOLLY CARTER, P. O. BOX 270203
25            CORPUS CHRISTI, TEXAS 78427 (361) 945-2525
```

1              MS. CARUSO:   Yes.

2              THE COURT:   And it may be.   You may be right about

3    it.

4              MS. CARUSO:   -- by consumer studies and experts.

5              So because, you know, as consumers people bring

6    different ideas and perceptions into things.

7              THE COURT:   What are the damages?   You have to

8    disclose how many hits were made on that RoboCut versus

9    Flowbee?

10             MS. CARUSO:   Well --

11             THE COURT:   Is that it?   What are the damages?

12             MR. BRIGHT:   Well, it's the money that they have been

13   paid, it is the money that we have lost, and it is potentially

14   attorney's fees and exemplary damages, depending on --

15             THE COURT:   So you're going to have to look at

16   RoboCut.   Are you going to have to add them in and see how much

17   they've made off this?

18             MR. BRIGHT:   We don't anticipate doing that, Your

19   Honor.

20             THE COURT:   How else could you find out what you

21   lost, except for what they got?

22             MR. BRIGHT:   I suspect it will be the subject of

23   forensic accounting that can show when this practice started

24   and --

25             THE COURT:   I see.

1   MR. BRIGHT: -- how it affected our profits.

2   THE COURT: Okay.

3   MS. CARUSO: You know, it's a very interesting

4   question, Your Honor.

5   THE COURT: It is, isn't it?

6   MS. CARUSO: Because, of course, the Plaintiff is

7   very free to sue the competitor for -- they're the ones who

8   chose to frame the ad the way that they did.

9   THE COURT: Except for you put it -- it was the

10   placement, is what he's saying, is that --

11   MS. CARUSO: It was placed --

12   THE COURT: Location, location, location.

13   MS. CARUSO: It was placed pursuant to our algorithm,

14   that's correct. They chose the words and they chose that

15   connection. Flowbee has sued this competitor before, in

16   California.

17   THE COURT: Really?

18   MS. CARUSO: Yes. So as you can see, though, I guess

19   maybe perhaps Google is perceived as having a bigger --

20   THE COURT: A hand in it?

21   MS. CARUSO: -- bank book.

22   THE COURT: Okay.

23   MS. CARUSO: So I'm happy to address anything else

24   Your Honor has questions on.

25   THE COURT: No, I think you've done a wonderful job.